FILED
JUL 1 2 2005
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Dr. Vasyl Michael Harik
P.O. Box 5606
Newark, DE 19714-5606
    Plaintiff

vs.

National Aeronautics and Space Administr.
(Dr. Michael Griffin, NASA Administrator
NASA Headquarters, 300 E St, SW
Washington, D.C. 20546-0001
    Defendant

CASE NUMBER 1:05CV01390

JUDGE: Rosemary M. Collyer

DECK TYPE: Employment Discrimination

DATE STAMP: 07/12/2005

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

1. Plaintiff is a resident of the city of Newark in the state of Delaware.

2. Defendant does business at the following location: 300 E Street, SW, Washington, D.C. 20546-0001.

3. This action is brought pursuant to:

    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e, *et seq.*, for employment discrimination on the basis of race, color, religion, sex, or national origin.

4. I am complaining about:

    Termination of my employment. I was terminated from my employment at NASA Langley twice on the following dates: May 16, 2002 and April 5, 2004.

    Other: The NASA Langley management had been involved in and condoned discriminatory conduct including a denial of several opportunities to participate in conferences, pressure for co-authorship "kick-backs," offensive comments about my work and my national origin (Ukrainian, which was confused at times for denigration with Russian) and a denial of access to the software tools and the software upgrades for many months.
        The NASA Langley management had been involved in stopping my EEO complaint process initiated on February 6, 2004, and the EEO complaint filled on March 18, 2004. Later, I was terminated in retaliation for my EEO activities.

5. The conduct of Defendants was discriminatory because it was based on:

    National origin

6. The facts of my claim are:

I am a U.S. citizen. I had been a NASA contractor employee, an on-site contingent worker at the NASA Langley Mechanics and Durability Branch from October 2000 until April '04. During this time, I had been affiliated administratively first with the ICASE Institute (2000-2002) and then with the Swales Aerospace (2002-2004). I was interviewed, hired, directed and effectively fired by the NASA managers, while the contractors handled most of the paperwork. Hence, I had employee-employer relations with both NASA contractors and NASA itself, as is confirmed by the NASA's 15 factor Contingent Worker Determination analysis (pp. 5, 6).

The demeaning references to my national origin had started with prolonged accentuated mispronunciations and misspelling of my name, but later these references turned offensive with phrases like "useless Russian approach", "a foreigner", "proletariat classification" of materials, "disastrous work", "you should off been a plumber back at home", "not American" etc. Such phrases were accompanied with a negative connotation and hostile demeanor. The hostile work environment was also maintained with other derogatory phrases against contractors as well. The culture of contractor mistreatment was not new at NASA, but my national origin increased the degree of my mistreatment turning it into continued harassment and a cause for discrimination as evidenced by many actions of differentiation between me and the U.S.-born contractors.

My opportunities to participate in professional conferences had been obstructed since January 2001 when the paperwork for the approval of my abstract for the June 2001 ASME conference was first pushed around in the NASA branch and later disappeared entirely. The branch secretary was saying: "I am not serving these foreigners contractors." Dr. Gates of NASA agreed to handle the abstract approval, but later no records could be found. Such approval was needed for any conference or publication of extended abstracts. While my efforts were blocked, a U.S.-born contractor, Dr. Odegard, was allowed to pursue the same conference opportunity. When I persisted, I experienced demeaning intrusions that amounted to mainly the "language police," contrary to my expectations for NASA co-authors. Technical input was virtually absent. During pre-conference meetings, the "format policing" and demeaning comments continued. Dr. Nemeth of NASA said then "now, we've broken your spirit so you'll do what we tell you."

Same discrimination continued in Summer 2001, when the planning of conference sessions for the 2002 AIAA SDM Conference began. Dr. Gates assigned only his Post Doc, Dr. Odegard, and Dr. Glaessgen of NASA to organize and lead the new sessions, while I also expressed interest and had appropriate experience. Later, Dr. Glaessgen had included me to help the informal organizing committee, and this was reflected in an official call for papers, but Dr. Gates had been repeatedly excluding my name when referring to these activities during the group meetings. Such behavior communicated that my input and my contributions are neither welcomed nor needed. It got worse since August 2001 when I was moved by NASA next to Dr. Gates' office, in the room with his Post Doc. In daily interactions, the favoritism toward his Post Doc, on one hand, and marked condescendance toward me, on the other hand, became the norm as the AIAA conference abstracts were reviewed and the talks organized into the sessions. Other activities were handled similarly.

In January 2002, Dr. Gates had pushed a mid-year salary increase and a promotion to a Staff Scientist for his 1.5 year-old Post Doc, contrary to the standard practice. I got an adjustment to my yearly salary increase only after raising this issue with my NASA branch head, who was pleased with my work according to the ICASE review that followed.

2



In January 2002, I finally completed an AIAA conference paper with Drs. Gates and Nemeth names on it, but any writing from them was withheld for a year. Dr. Nemeth suggested holding the paper still, but I wanted to proceed with publication, and told him that his name can be removed if he cannot contribute at least some writing on time. He made a nasty scene in my office with derogatory language pushing for his directive. In March, derogatory comments came from Dr. Gates as well, when it became clear that he is not going to be a co-author on a MRS Symposium paper I wrote with a contractor, Dr. Sarah Frankland. Dr. Gates started to slander my modeling work as trash, disaster, etc. Later, our paper was published in a good scientific journal, but our collaboration was blocked.

In May 2002, Dr. Gates put his name first on our SEM conference paper listing and grossly misrepresented my technical productivity to the NASA branch head, Dr. Damodar Ambur, and argued him to withdraw my research funding from the ICASE institute due to poor technical performance. Dr. Ambur had talked to me, but he supported his senior engineer in the dispute. He had called the ICASE Director, Dr. Manuel Salas, told about the withdrawal of funding and the termination of my task. Dr. Salas sent me a letter of termination. Dr. T. Gates' actions had directly led to a loss of my position at the ICASE Institute at NASA LaRC.

After I had complained, I was given a task with the Swales Aerospace with lesser benefits.

Later, I was denied again several opportunities to participate in professional conferences. In October/November 2002, I was forced to cancel my ASME conference talk and session chairing, while a U.S.-born contractor, Dr. Odegard, received both opportunities. In March 2003, I was denied an opportunity to participate in the APS conference as a co-author when my name was removed from the talk covering my research. In August 2003, my participation in a NASA workshop as a co-author *was publicly obstructed with a very damaging claim of my false authorship*. The last two incidents also involved a younger U.S.-born contractor, who received both opportunities. All incidents involved Dr. Gates, while the NASA branch head was responsible for taking measures after my complaints in the monthly reports in April and August/September 2003 and January 2004. These incidents were accompanied by Dr. Gates' comments that I was not a good choice to present research done at NASA Langley in contrast to U.S.-born contractors.

Overtime, the work environment became increasingly hostile. Even the polite religious advisor, Mr. Everett, who was calling for prayers before NASA branch gatherings, started to mix-in negative or pressuring comments: "You know, the end of Cold War brought a lot of hardship and suffering to many people here." I was guilty of benefiting from the end of Cold War. A similar sentiment was expressed to me by an older security guard, a former military.

Such an environment had influenced not only my work habits, but also affected work safety. My requests to check safety incidents involving irritant aerosols met little sympathy and no cooperation in May and September 2003. My safety report was shelved and later complaints about the lack of investigation and the maintenance of safety records were ignored.

Apparent sabotage extended to my working needs as well. Since September 2002 until April 2003, and in March 2004, I was denied access to a commercial software called ANSYS-Multiphysics and its upgrades (between August 2003 and March 2004) as evidenced by my written monthly reports. The same software was provided to a younger U.S.-born contractor, Dr. Odegard, who was my office mate for some time and provided e-mails supporting this claim. Dr. Gates of NASA was coordinating the ANSYS software distribution as evidenced by an e-mail with the dates of software delivery from a vendor. The delays negatively affected my work.

The local NASA management first condoned my discrimination when I was initially mistreated at the NASA branch and wrongfully fired in May 2002, and when the critical software was intentionally withheld for many months along with a few conference opportunities. Later, the management turned a "blind eye" on the harassment reported in blunt terms in September 2003 and delays in investigation of the safety incidents reported in May and September 2003.

Since my internal complaints had no effect for months, I initiated a discrimination review with the NASA EEO Program Office in early February 2004, right after another harassment. After hearing my account of the hostile work environment, harassment and discrimination, the Swales Human Resources Director and the NASA Langley EEO counsel agreed that there were significant grounds for filing an EEO complaint. However, in late February, right after a meeting between the Swales management and the NASA review panel for the SAMS contract and its management fees, the Swales and NASA management started to flatly deny any of the raised problems and to pressure me to stop EEO complaint process. Dr. Ambur, who was the NASA branch head, technical monitor and the SAMS Review Panel member, said: "If Swales wants to treat you as their employee, then they should find a task for you."

The top SAMS manager fired me on April 5 with NASA's concurrence, right after I filled a formal EEO complaint in March with the NASA Langley EEO office and reiterated later that I will not stop the NASA's EEO inquiry.

The Swales and NASA management resorted to the distortion of facts to find causes for my termination and to derail my EEO complaint at the NASA Langley. The sick leaves associated with earlier safety incidents were taken out of context and made look as misconduct contrary to the company's prior evaluation. The safety accidents at NASA were not recorded as such. My resignation from one of my tasks (in order to avoid fraudulent work-time charges to a government contract) was not sudden after the months of complaints about the software delays. The management also falsely claimed that there were no software delays contrary to many monthly reports.

Similar distortions had occurred during the conduct of a NASA EEO inquiry to gather information whether I was a contingent worker within the meaning of the Federal Sector EEO process. Conclusion of the NASA Langley EEO office that such jurisdiction was not "supported, after consideration of the 15 factors for the Contingent Worker Determination," was based on the *false information* provided by the NASA Technical Monitor, who was named in the EEO complaint as a participant, and the Swales managers, who have been denying any problems.

Answers to the key factors for the contingent worker determination had to be corrected as follows (NASA avoided investigating these answers contrary to its procedures):

**1st factor:** NASA did control when, where, and how I performed my job. I was placed to work within a branch building next to NASA personnel, and was moved twice by NASA. I was expected to mostly work between 9 a.m. and 4 p.m., and I was often directed by NASA personnel how to perform my job.

**6th factor:** NASA did have the right to assign additional projects to me, and did use it several times. I was abruptly directed to start working in the new area of nanotechnology in 10-11/2000; I was to repeatedly assist the nanotube-interface-modeling efforts in 9-12/2002, the ANSYS-based visualization of the Airbus tail model in 8-9/2003, and the new structural-optimization-grant efforts in 4, 9-12/2003.



**7th factor:** The NASA personnel made it clear what were the appropriate hours of work. Any significant changes in the pattern of working hours had to be cleared with the NASA Tech Monitor first (such practice was reinforced by the formal contractor supervisors). Duration of the job on a specific task was controlled by the NASA Tech Monitor.

**9th factor:** Swales Aerospace had played no role in providing any technical assistance required for the job. It also did not hire any assistants. Most of the assistance received for the job was ether directed or controlled by NASA. NASA also paid for my training on the ANSYS software.

**12th factor:** The NASA Tech Monitor had control over the use of the worker's benefits such as annual leave. If the leave was supported by NASA, the formal contractor supervisor would "rubber stamp" it.

**14th factor:** The NASA Tech Monitor and the NASA branch head can discharge the worker. This has been done in the past, in May 2002, in the case of employment with the ICASE Institute at NASA LaRC. The NASA branch head controlled and directed the hiring including an interview, the salary raises and its revisions, as well as the firing by closing task. I believe that the NASA branch head/Tech Monitor had facilitated the latest firing as well.

**15th factor:** The NASA branch head believes in creating the employer-employee relationship by interviewing the new candidates, repeatedly using references such as "NASA contractor employees are a part of the NASA branch" or "a part of the family", enforcing the branch internal rules on the contractor employees, etc. I often had no choice but follow this approach.

I was a good NASA contingent worker, who worked hard in-house on NASA's tasks for almost four years. My performance reviews were excellent. Under extreme circumstances, I showed a lot of patience and endurance while trying to resolve very serious problems within the NASA's internal and legal frameworks. In return, I was subjected to the pain and suffering, mental anguish, embarrassment and humiliation. I had been out of work since my discharge in April of 2004, had to cash in and deplete my savings to survive, suffered losses in my professional standing and earning power as an active researcher, experienced extreme humiliation, emotional distress and mental anguish.

7.  The approximate number of people employed by Defendant is: *15,000.*_____

8.  The events I am complaining about took place on the following dates or time period: December, 2000 – April, 2004.

9.  I filled charges on the following dates: __March 18, 2004,____with:

NASA Langley Equal Employment Opportunity Program Office
(NASA Langley Research Center, Hampton, VA 23681)

and on June 22, 2004 with

NASA Office of Diversity and Equal Opportunity
(Attn: Agency Docket No. NCN-04-LaRC-A032CW. NASA Headquarters, 300 E Street, SW, Washington, D.C. 20546-0001)

10. I received the NASA's final decision letter (copy attached) on the following date: _April 15, 2005._

WHEREFORE, plaintiff asks the Court to grant such relief as may be appropriate, including but not limited to:

Injunctive relief: I would like the Court to order an investigation of the employee working conditions and the conflict resolution practices at NASA Langley.

Back pay adjusted for appropriate salary raises and the cost of lost benefits.

Reinstatement of an appropriate consulting contract with a different NASA Center free of the hostile work environment or a monetary compensation for an equivalent three year contract in the amount of __$330,000.__

A monetary compensation for the losses of earning power and professional standing in the amount of _____$300,000.__

Monetary damages for the pain and suffering in the amount of:__$250,000._per year (or a quarter) of mistreatment____

Costs, legal support and attorneys fee (33% of the total monetary sum).

Other: A written apology from each NASA manager involved.

_____7/12/05_____                    _____V. Harik_____
(Date)                                (Signature)

Dr. Vasyl Michael Harik
P.O. Box 5606
Newark, DE 19714-5606
Phone: (302) 983-8060