

VIRGINIA EMPLOYMENT COMMISSION

5235 JOHN TYLER HIGHWAY

WILLIAMSBURG, VIRGINIA 23185

FRIDAY, JUNE 18, 2004

12:00 PM

THURSDAY, JULY 15, 2004

9:00 AM

**IN THE MATTER OF:**

VASYL HARIK

S.S. NO. 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

     APPELLANT

SWALES & ASSOCIATION, INC.

     APPELLEE

---

     The above-mentioned matter came on for hearing pursuant to notice in the local office of the Virginia Employment Commission, 5235 John Tyler Highway, Williamsburg, Virginia, on Friday, June 18, 2004, at 12:00 p.m. and Thursday, July 15, 2004, at 9:00 a.m., before LaRhonda J. Carter, Appeals Examiner.

---

**A P P E A R A N C E S**

Vasyl Harik, Claimant

Pamela Butziger, Employer Representative

Andrew Srokowski, Witness for Employer

**VASYL HARIK**

# C O N T E N T S

STATEMENT BY LARHONDA J. CARTER . . . . . . . . . . . . . . . . . . . . . . 2

**PAMELA BUTZIGER**

Direct Examination by Ms. Carter . . . . . . . . . . . . . . . . . . . . . . . . . .    6
Cross Examination by Mr. Harik . . . . . . . . . . . . . . . . . . . . . . . . . .   31
Redirect Examination by Ms. Carter   . . . . . . . . . . . . . . . . . . . . .   47
Recross Examination by Mr. Harik. . . . . . . . . . . . . . . . . . . . . . . .   50

**ANDREW SROKOWSKI**

Direct Examination by Ms. Carter. . . . . . . . . . . . . . . . . . . . . . . . .   55
Direct Examination by Ms. Butziger . . . . . . . . . . . . . . . . . . . . . .   65
Cross Examination by Mr. Harik   . . . . . . . . . . . . . . . . . . . . . . . .   66

**VASYL HARIK**

Direct Examination by Ms. Carter   . . . . . . . . . . . . . . . . . . . . . .   83
Cross Examination by Ms. Butziger . . . . . . . . . . . . . . . . . . . . . . 112
Redirect Examination by Ms. Carter . . . . . . . . . . . . . . . . . . . . . . 116

**CLOSING STATEMENTS**

By Ms. Butziger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124
By Mr. Harik . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

**VASYL HARIK**



## E X H I B I T S

| **Exhibit Number** | **Description** | **Page** |
|---|---|---|
| Exhibit Number 1 | Claim for Benefits | 124 |
| Exhibit Number 2 | Emails/Record of Facts | 124 |
| Exhibit Number 3 | Deputy's Determination | 124 |
| Exhibit Number 4 | Letter of Appeal | 124 |
| Exhibit Number 5 | Notice of Hearing-June | 124 |
| Exhibit Number 6 | Copies of Emails | 124 |
| Exhibit Number 7 | Progress Reports/Complaint | 124 |
| Exhibit Number 8 | Notice of Hearing-July | 124 |

**VASYL HARIK**

| 1 | A. | I'm the manager of Human Resources. |
|---|---|---|
| 2 | Q. | You may consult any documents you have in order to answer the |
| 3 | | following questions. On what date was the claimant hired? |
| 4 | A. | June 18th, 2002. |
| 5 | Q. | What was the last day of work for the claimant? |
| 6 | A. | April 5th, 2004. |
| 7 | Q. | Did you say six or five? |
| 8 | A. | Five. |
| 9 | Q. | What was his position when he separated? |
| 10 | A. | Structural engineer. |
| 11 | Q. | Was he considered full time or part time? |
| 12 | A. | Full time. |
| 13 | Q. | What was his rate of pay at the time of separation? |
| 14 | A. | $36.70 per hour. |
| 15 | Q. | Why is the claimant no longer working for Swales & Association? |
| 16 | A. | Ah, gross misconduct, conduct, in accordance with our policy. |
| 17 | Q. | Was he discharged or did he quit? |
| 18 | A. | No, he, he was terminated for cause because of gross misconduct. |
| 19 | | Specifically, insubordination. |
| 20 | Q. | And was he discharged on his last day of work of April the 5th, 2004? |
| 21 | A. | Yes. |
| 22 | Q. | All right, you said gross misconduct according to policy, specifically |
| 23 | | insubordination, is that correct? |
| 24 | A. | Yes. |
| 25 | Q. | What is the employer's policy regarding insubordination, ma'am? |
| 26 | A. | I've actually provided that in a document that I sent. It's right out |

VASYL HARIK

1          come to his office for a meeting, the manager's office?

2    A.    The first meeting request was Monday, March 22nd, at 9:00 AM. And

3          that's on page, you can see that on page four. Or page, ah, three of

4          four on that document at the very top. Where the---

5    Q.    Ah, and was the request made by email or how was the request

6          made?

7    A.    Yes, the request is made by email, which seemed to be the manner in

8          which Dr. Harik was communicating with Andy.

9    Q.    When was the email sent out for this Monday morning meeting?

10   A.    This was sent Friday, March 19th at 2000, or, 2004 at 2:30 in the

11         afternoon. You can see the date at the bottom of page two.

12   Q.    Does the employer keep any type of confirmation that he actually

13         received it?

14   A.    Ah, no. We, Andy did not keep a confirmation that he had received it.

15   Q.    Did the claimant attend the meeting?

16   A.    No.

17   Q.    Did the claimant contact the employer?

18   A.    No.

19   Q.    Did the employer mention the meeting to the claimant at all?

20   A.    We contacted him again by email and asked him to come on Monday,

21         March 29th, at 9:30, we asked him to come a second time.

22   Q.    When did you contact him for the second meeting, ma'am?

23   A.    Again, you can see it in this email, but it says, "Wednesday, the 24th

24         of March at 10:15" in the morning. This is in the middle of the text on

25         page two.

26   Q.    And when was the second meeting to be held?

11

VASYL HARIK

1    A.    Monday, March 29th.

2    Q.    Did the claimant respond?

3    A.    No. He, he sent an email with some, ah, progress reports that he had

4          submitted on some other, for some other assignments, but he did not

5          come to the meeting, he did not provide what we asked him to

6          provide.

7    Q.    What did you ask him to arrive?

8    A.    To bring---

9    Q.    (Inaudible)

10   A.    A report on the status of his work, where he was on everything. And,

11         actually, in fact, when he did respond, he resigned from a piece of

12         work. He had two different assignments he was working on.

13   Q.    And, ah, did he not attend the, the March 29, 2004, meeting?

14   A.    No, he didn't. Actually, what he says is that he will answer any

15         questions by email. And that's on page two of the document, ah, in

16         the middle, it says, "Please find my earlier monthly report," which is

17         not what we asked for, "Attached the cover of the page you asked for.

18         If there are any questions, I'll answer them by email."

19   Q.    After the March 22nd hearing, I'm sorry. The March 22nd meeting, the

20         time for that had lapsed and the claimant did not appear.

21   A.    Correct.

22   Q.    Did the employer, ah, warn him or speak to him about not appearing?

23   A.    No, we just asked him to come on another day, we said, "Let's try this

24         again, come on this day."

25   Q.    All right. After the claimant did not participate in the March 29th

26         meeting, was he spoken to about that?

VASYL HARIK

1   A.   Yes, he rec, received an email from Andy that said, "Are you refusing

2        to, to, to meet with me?"

3   Q.   When was that email sent, ma'am?

4   A.   Umm, that is on page one of this document, it was sent Tuesday,

5        March 30th, ah, at 9:00 AM.

6   Q.   Did the claimant make a response?

7   A.   Umm, no, I don't think so.

8   Q.   Did he, did the claimant and the manager ever meet?

9   A.   No. Actually, the manager wrote again and said, "I'd like to receive

10       your report." Again, it's in this document---

11  Q.   What, what would that date be, ma'am?

12  A.   This is, ah, Tuesday, the 30th of March at 11:23.

13  Q.   So this would be the same day?

14  A.   Same day, he said, "I'd like to receive your report by the close of

15       business on March 31st."

16  Q.   What, did the claimant make a response?

17  A.   Yes, that, that's where this email comes in. Mr. Srokowski, at the very

18       top, "This bombardment of a contractor email by the managerial

19       muscle-flexing emails from a level 3 manager is not only a bad

20       example of micromanagement, but," can you see where I'm reading?

21  Q.   Yes, I'm looking at this now, go ahead.

22  A.   In addition to that, throughout the text of the original emails that

23       were exchanged, Dr. Harik had added additional text. You have to

24       read through the whole thing to see what he writes. Umm, you know,

25       just all kinds of things that I think are very, umm, inappropriate and

26       unprofessional to be saying to your manager who has asked to meet

13

VASYL HARIK

1    make sure that he was only working in a capacity that his doctor

2    wanted him to and he said that he had no plans to go back and see

3    the doctor unless things changed and I asked him how he was

4    determining when he felt well enough to come to work and he said

5    that he was making that own decision himself. So, we did have to

6    suspend the, ah, the sick benefits because it had ex, exceeded the

7    intention of the benefit. Actually, during the last year of Vasyl's

8    employment, he charged over five hundred hours of sick leave, umm,

9    which is about twenty-five percent of your, your time in a year. Ah,

10   company average is about twenty-four hours of sick leave, so it was

11   an excessive use of a benefit so we did cease sick leave, umm, for him

12   when he did not, declined to file a disability claim.

13 Q.  All right, you had indicated that, ah, for the meeting on March 29th

14      you had requested, ah, a report of the status of his work? From the

15      claimant, is that correct?

16 A.  Yes, his manager asked for (inaudible).

17 Q.  All right, and was that ever provided to the manager?

18 A.  Ah, no, it was not produced to the manager.

19 Q.  Was it produced to the employer at all?

20 A.  No. Not in the manner that we, we asked. Ah, Vasyl did produce

21      what's called a, a progress report, which is something we give to our

22      customer. This is not what the manager was asking for.

23 Q.  Had the claimant provided a report of the type that you were asking

24      for previously?

25 A.  No, he had not.

26 Q.  How did he know, ah, what the manager was asking for?

16

**VASYL HARIK**

1    A.    Yes, I have.

2    Q.    Ah, back, are you aware that it's eight page report?

3    A.    I don't know how many pages it is, but it is lengthy.

4    Q.    And are you aware that the only software that is cited, ah, ah, that is

5          like and is the code ansys?

6    A.    No, I'm not familiar enough with that document to make that

7          determination.

8    Q.    Have you read the title of the report? "Availability of the Finite

9          Element Code"---

10   MS. CARTER:

11        She's read that, sir, she read that. Ask a different question.

12   Q.    Ah, are you aware that, ah, the only reports requested from, ah,

13        Swales employees like me about, ah, ah, ah, any, ah, about any, ah,

14        work-related activities, ah, only those monthly progress reports?

15   A.    Ah, I'm sorry, you're, can you repeat the question? I'm not sure I

16        understand it.

17   Q.    Are you aware that the on, the only type of report requested ever by

18        Swales management from Swales employees like me, me, ah, the

19        reports that are work-related are only those monthly progress

20        reports?

21   A.    Ah, no, that, that is not what I'm, my understanding. Employees, ah,

22        throughout the organization are asked to provide a, a wide variety of

23        reports depending on situations.

24   Q.    Ah, are you aware that the, ah, scheduling of the first meeting with

25        Mr. Srokowski that I did attend was, ah, scheduled by phone and, ah,

26        email and it was done, ah, ah, through John Mitchell and, ah,

VASYL HARIK

1      Vaughn Behun, ah, my, ah, immediate, ah, supervisors?

2  A.   Ah, let me just look at the date of that, find out exactly what we're

3      talking about here. Here we go, okay. I am aware of a meeting that

4      took place prior to March 19th where, ah, Andy Srokowski wanted to

5      spend some time with you to understand some of the things that you

6      and I had spoken about in February. And that you did come to that

7      meeting. And you didn't come to subsequent meetings.

8  Q.   Are you aware that during that meeting Mr. Srokowski, ah, has, ah,

9      car, characterized the, the problems that I'd been having with, ah,

10     software delays and, ah, the related, ah, relationship with, ah, Mr.

11     Gates as those problems were characterized as, ah, ah, not

12     significant, ah, not worthy of, ah, a complaint? Are you aware of that?

13  A.   No, I don't have any knowledge of that.

14  Q.   Ah, have you received, ah, in, in your---

15

16                            **TAPE 1, SIDE 2**

17

18  MS. CARTER:

19      Ah, Mr. Harik, was there any conversation while I did so?

20  MR. HARIK:

21      Ah---

22  MS. CARTER:

23      While I changed the tape to the second side?

24  MR. HARIK:

25      I would like to repeat my question.

26  MS. CARTER:

**VASYL HARIK**

1      feel that the two things that you said really, umm, supported, ah, the

2      rel, relationship problems that you had mentioned. That, those are

3      the only things that I'm aware of, I'm not aware of what's going on

4      with your conversations with the Langley EEO office, I only had two

5      examples that you've provided to me as things that were

6      uncomfortable to you in the trailer.

7  Q.    Are you aware that I, ah, had a conversation with my, one of my

8      supervisor, John Mitchell, about, ah, the problems with software

9      availability, and I also, ah, and that I offered him, ah, ah, additional

10     information from the vendor, ah, that includes, ah, specific

11     information about the, the code and, and the code updates?

12  A.    Ah, ah, ah, I, I'm not familiar with that conversation. Again, the lack

13     of software had nothing to do with your termination for cause. It has

14     nothing to do with your insubordination or gross misconduct.

15  MS. CARTER:

16     Any more questions, Mr. Harik?

17  MR. HARIK:

18     Ah, no, ma'am.

19  MS. CARTER:

20     All right. At this time, it's 1:13, I do have a hearing that is scheduled

21  for 1:00 o'clock. Ah, we do have to have information from the claimant's wis,

22  witness, I'm sorry, the employer's witness, and the claimant has had an

23  opportunity to present his case in full. Therefore, the, this hearing will have

24  to be continued and rescheduled for a different time. The central office will

25  notify all parties of the new date and time of the continued hearing. Ms., ah,

26  Butziger, please don't discuss what you heard in here with anyone; you are

VASYL HARIK

| | | |
|---|---|---|
| 1 | Q. | Could you spell your last name, please? |
| 2 | A. | S-R-O-K-O-W-S-K-I. |
| 3 | Q. | Mr. Srokowski, who are you employed by? |
| 4 | A. | Swales Aerospace. |
| 5 | Q. | And what is your position there? |
| 6 | A. | Ah, currently I'm a technical manager in the corporate office. Ah, |
| 7 | | prior to this assignment I was the manager of our Hampton office. |
| 8 | Q. | And do you know the claimant, Mr. Vasyl Harik? |
| 9 | A. | Yes, I do. |
| 10 | Q. | And were you in a supervisory position above him? |
| 11 | A. | Yes, I was. |
| 12 | Q. | The testimony has been that the claimant was discharged, ah, for |
| 13 | | insubordination, gross misconduct and failing to, umm, meet as |
| 14 | | requested and to produce documents. |
| 15 | A. | That is correct. |
| 16 | Q. | What I'm going to do is I'm going to let you tell me what happened, |
| 17 | | sir, in regards to failing to produce documents and to meet with you. |
| 18 | | Or to meet with anyone in a supervisory position. |
| 19 | A. | The, ah, ah, I had a meeting with, ah, ah, ah, Vasyl Harik had, ah, |
| 20 | | two, ah, two assignments. One assignment was, and was working half |
| 21 | | time on each assignment. One was for the USRA, ah, a small |
| 22 | | subcontractor that the company had with, ah, USRA; the other one |
| 23 | | was a task under a NASA/Langley task order. Ah, under the same |
| 24 | | contract. Ah, so he was supposed to be spending approximately 50% |
| 25 | | of the time on one, 50% on, on another. Ah, there were a number of |
| 26 | | issues raised by Dr. Harik relative to his work environment over a |

VASYL HARIK

1      certain period of time where we ended up, ah, moving him from, ah,

2      his location, office location, ah, to another location very close to our

3      administrative offices. To remove him from his, ah, the, ah, where he

4      claimed was a hostile work environment. He also claimed that, ah,

5      some, ah, ah, NASA civil service employee was, ah, withholding from

6      him software that he needed to, ah, do his work effectively. Umm, I,

7      ah, got together with the NASA/Langley civil service task manager,

8      ah, to try to ascertain from him what the exact assignment or

9      components of, of work was and, ah, what kind of software was

10      needed and, ah, whether Mr. Harik had, ah, access to such software.

11      I felt it was, ah, the company's responsibility, ah, to really see

12      whether, ah, Dr. Harik had the tools that he needed to do his job

13      effectively. Ah, there were budget cuts, ah, that were being

14      contemplated by NASA/Langley a few months down the road and the

15      task manager, NASA/Langley task manager, basically told me that,

16      ah, "We needed to see some progress on this task, ah, because, ah, I

17      don't know, at the site, you know, of the various things that I am

18      funding, ah, what will I, ah, cut back?" So then I had a meeting with

19      Dr. Harik, ah---

20  Q.    Do you recall when that was?

21  A.    Ah, I think that was the March 10th or 11th, I believe.

22  Q.    All right, go ahead.

23  A.    Ah, when I arranged to meet with him to get from him directly, ah, his

24      view of what the task was, what he needed, ah, to do the job. Ah,

25      during that meeting, ah, I, I inquired of him, ah, because, of course,

26      in doing research, ah, there are all kinds of stumbling blocks in, ah,

VASYL HARIK

| | | |
|---|---|---|
| 1 | | performing your work. Ah, he, and people encounter stumbling blocks |
| 2 | | overcome them so I wanted to make sure that I understood exactly |
| 3 | | the nature of the difficulties he was having with the work. |
| 4 | | Subsequent to that meeting, I, ah, told him that I would get back with |
| 5 | | the NASA/Langley task manager, ah, and, ah, then communicate |
| 6 | | back to him what the task manager said. And, excuse me, I want to |
| 7 | | get a drink of water. Then, ah, I ended up, after a period of time, ah, a |
| 8 | | couple of weeks, I wanted to see what, sit down again with, ah, Mr. |
| 9 | | Harik to see what he was doing because he had to balance both of |
| 10 | | those activities. I wanted to see exactly what he was doing and |
| 11 | | continue those discussions. Ah, so I sent, ah, Mr. Harik an email |
| 12 | | requesting him to meet with me and bring a complete report on his |
| 13 | | work activity--- |
| 14 | Q. | When--- |
| 15 | A. | What was he doing for the last two or three weeks. |
| 16 | Q. | All right, when did you first request to meet with him and to br, when |
| 17 | | did you first request to meet with him? |
| 18 | A. | Okay, let me see, my first, ah, this is subsequent, I had only one |
| 19 | | meeting with Dr. Harik, which is, which is the first one I mentioned. |
| 20 | Q. | All right, when did you request to meet with him after that? |
| 21 | A. | After that I sent an email, ah, let me, ah, refer to my, my notes. Ah, |
| 22 | | ah, I sent the meeting to him, ah, a re, meeting request, ah, Friday, |
| 23 | | ah, March 19th. |
| 24 | Q. | When was the meeting to be held? |
| 25 | A. | Meeting to be held, ah, I, ah, requested him to come to my office at |
| 26 | | 9:00 AM Monday, ah, March 22nd. To bring, and, and bring the |

VASYL HARIK

1       written report with him so we could discuss it.

2    Q.    And did he, ah, come to that meeting?

3    A.    He did not.

4    Q.    Did he give an explanation for not coming?

5    A.    Ah, he, I received absolutely no communication whatsoever from, ah,

6       Dr. Harik.

7    Q.    Did you communicate with him after that?

8    A.    Ah, subsequent, ah, to that, I, ah, ah, let's see, let me look here. Ah,

9       one thing, March 24th I sent him an email saying he failed to respond

10      to my meeting request so I asked the, to try this again and requested

11      a meeting with him personally on Monday, March 29th at 9:30 and

12      asking him to bring the report, ah, that was originally requested.

13   Q.    How do you know the claimant was receiving the emails?

14   A.    Beca, ah, the reason I, excuse me, I know the claimant was receiving

15      the emails was because, ah, the email that he sent to me, ah, I

16      clicked on "reply." And, so, if someone sends me an email and I click

17      on "reply," I would expect that individual to re, not only receive the

18      email, but, ah, to actually send a reply to the email fr, that he used to

19      originate this first message.

20   Q.    So did he send you a message, ah, in between the two meeting

21      requests that you could reply to?

22   A.    Ah, yes he did, hang on one second. Let, let me get my (inaudible)

23      here. Yes, he ca, yeah, he, yeah, he, well, ah, actual, actually, ah,

24      actually, the sequence is, is a little reversed. Ah, Dr. Harik sent me an

25      email, ah, originally, on Friday, March 19th, at 1:07 PM, in which, ah,

26      he talked about the, the meeting that we had, ah, on or about March

VASYL HARIK

1        10th. That's the email I reply, and he, he requested to telecommute in

2        that email and he said that, ah, ah, even though he was moved to, to

3        the, ah, new location, he was still perceiving a hostile work

4        environment. That is when I hit the, the "reply" button and re, told

5        him he could not telecommute because we, ah, the company does not

6        have a telecommuting policy, and was it, that was the first request.

7    Q.    All right. Now, you said, umm, you asked him to meet with you

8        personally on March 29th at 9:30 and to bring the requested reports.

9        Did he meet with you at that time?

10   A.    No, he did not, and I have received, ah, no communication from him

11       that he would or would not meet with me.

12   Q.    Did he submit any re, ah, reports?

13   A.    Ah, he sent me, ah, the, a report by email. And, basically, said, ah,

14       ah, he sent me a, he sent me a monthly report, basically a standard

15       type of report, ah, that, ah, is, is submitted to the customers. And,

16       ah, ah, he said, "Well, gee," ah, in effect, he said that, "If you have

17       any questions, ah, I'll answer them by email."

18   Q.    Please hold. Did you make any response by that time? Umm, after

19       that time?

20   A.    Umm, af, after that, I sent him another email, base, basically which,

21       ah, which, ah, said, ah, "Again, you didn't respond to my request to

22       meet with me to discuss your work." And I said in, in, in that reply, "I

23       interpret what you say in your latest email to mean that you refuse to

24       meet with me. Is this interpretation correct?" And then I, I included

25       another point just to make sure that he understood that I wanted to

26       cover and to sit down and discuss with him all of the factors. So I

**VASYL HARIK**

1   CROSS EXAMINATION OF ANDREW SROKOWSKI BY MR. HARIK:

2   Q.   Mr. Srokowski, isn't it true that, ah, ah, you and I had, ah, never had

3        a personal one-to-one meeting to discuss either my work or reports

4        until my EEO complaint activity?

5   MS. CARTER:

6        All right, let him answer.

7   A.   What was the question, again?

8   MS. CARTER:

9        Are you not able to hear him, sir?

10  MR. SROKOWSKI:

11       No, I couldn't hear him.

12  MS. CARTER:

13       Okay, sit, ah, speak up a little bit louder, Mr. Harik. He's going to ask

14  you again, go ahead, sir.

15  Q.   Isn't it true that even though I had vocally complained before, for

16       many months, about severe delays with software in my monthly

17       reports, even though I did that, we had never had personal one-to-one

18       meetings to discuss neither my work nor my reports prior to my EEO

19       complaint activity?

20  A.   Ah, number one, I was not reading your monthly reports, those were

21       read by your supervisors so I was not aware of your, either your

22       problems, ah, that you were having until, and when those were

23       brought to my attention, ah, originally because, ah, of excessive,

24       excuse me, of excessive sick leave and then I was made aware of the

25       fact that you were complaining about a hostile work environment,

26       then I agreed to have you move, ah, to very close by our

66

VASYL HARIK

1      administrative offices and then subsequent with that, I met with the

2      NASA/Langley task manager to get their view, or his view, and when I

3      got his view, then I requested the, the initial meeting with you. That

4      was the sequence of events. Now, any, any complaints that you

5      referred to, I am not aware of when you made them, to who you made

6      them and what you said.

7 Q.      Isn't it true that, ah, as a Hampton, ah, office manager, ah, you were

8      actually, ah, RCD program manager, right?

9 A.      I was the manager of all activities by all Swales employees reporting

10      to me in Hampton, Virginia.

11 Q.      That's correct. Isn't it true that, ah, all the monthly reports of, ah, all

12      the employees were compiled into, ah, one big report which was sub,

13      which either was submitted to you or you were responsible to review

14      on regular basis?

15 A.      All the reports were, the monthly reports, were individual reports for

16      individual tasks over approximately a hundred twenty monthly

17      reports every month. I had, as the manager of the contract, I am

18      responsible for the submittal of those reports to the government. I

19      would read, th, those reports of, ah, maybe two or three as a sample,

20      ah, every month but I relied on my, ah, functional manager and the

21      supervisors, ah, that reported to them for the accuracy and

22      completeness of those reports. I was not responsible to read every

23      single word in those reports. Just the responsibility was to make sure

24      that they got submitted to the, ah, NASA customer.

25 Q.      Are you, isn't it, ah, true that, ah, the reports that, ah, contained, ah,

26      some, ah, serious problems with the task, either resources or

**VASYL HARIK**

1        Mr. Srokowski has left.

2    MS. CARTER:

3        All right, at this time we will turn to the claimant. Mr. Harik, if you'd

4    please raise your right hand. Do you swear or affirm the testimony you're

5    about to give will be the truth and the whole truth?

6    MR. HARIK:

7        Yes, I do.

8    VASYL HARIK, AFTER FIRST BEING DULY SWORN, WAS CALLED AND

9    EXAMINED BY LARHONDA J. CARTER, APPEALS EXAMINER.

10   DIRECT EXAMINATION OF VASYL HARIK BY MS. CARTER:

11   Q.   All right, now I'll ask you to speak up. Can you state your name for

12        the record?

13   A.   Ah, Vasyl Michael Harik.

14   Q.   Mr. Harik, what is your Social Security Number?

15   A.   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.

16   Q.   Who's the last employer that you worked for for thirty days or two

17        hundred and forty hours?

18   A.   Ah, Swales & Associates.

19   Q.   What was your position there, sir?

20   A.   Senior structural engineer.

21   Q.   You may consult any documents you have in order to answer the

22        following questions. On what date did you begin working for Swales?

23   A.   On, ah, June 16th, 2002.

24   Q.   What was the last day you worked for them?

25   A.   April 5th, 2004.

26   Q.   Were you considered full time or part time?

**VASYL HARIK**

1    A.    Full time.

2    Q.    What was your rate of pay at the time of separation?

3    A.    It was, ah, about, ah, 37 an hour, $37 an hour.

4    Q.    Why are you no longer working for Swales Aerospace?

5    A.    Because I was dis, terminated.

6    Q.    And were you terminated on last day of work of April the 5th, 2004?

7    A.    That's correct.

8    Q.    What reason was given to you on that day for your---

9    MS. BUTZIGER:

10    Ms. Carter, I can't hear the responses.

11    MS. CARTER:

12    All right, if you could speak up, Mr. Harik.

13    Q.    What reasons were given to you on that day for your discharge?

14    A.    Ah, on the day of discharge I received a, ah, termination letter that,

15    ah, ah, enumerated a number of, ah, vague reasons, ah, that, ah,

16    were, ah, mostly based on a, ah, dis(inaudible)---

17    MS. BUTZIGER:

18    Hello?

19    A.    Evidence.

20    MS. CARTER:

21    All right, hold on. All right, Ms., ah, Butziger, he gave the testimony,

22    umm, of his name and Social Security Number, his position was senior

23    structural engineer, he began working on June 16th, 2002, the last day of

24    work was April 5th, 2004. He was considered full time and his rate of pay

25    was $37 an hour. He indicated he was terminated on April 5th, 2004, he was

26    given a termination on that day giving, ah, reasons of his discharge based

**VASYL HARIK**

1    upon vague evidence. Were you able to hear any of the last part of his

2    testimony?

3    MS. BUTZIGER:

4        No, not regarding, ah, he, he mentioned that he was given a letter for

5    termination, that's all I heard.

6    MS. CARTER:

7        All right, what I'm going to do is see if I can scoot the phone up.

8    Q.    All right, ah, you said you were given a letter, sir? You heard the

9          employer's testimony today regarding, ah, gross insubordination.

10         Were you aware of the employer's policy, ah, for insubord, for

11         insubordination, sir?

12   A.    No, I wasn't aware of, ah, the employer's policy about insubordination

13         nor I was aware of the, ah, nor I was aware about the, umm, types of,

14         ah, conduct, ah, that would qualify for insubordination.

15   MS. CARTER:

16         All right, I'm going to show to the claimant, can you hear him now,

17   Ms. Butziger?

18   MS. BUTZIGER:

19         Ah, somewhat.

20   MS. CARTER:

21         All right, I'm going to have to ask you to speak up, because she does

22   have the right to hear your full testimony.

23   Q.    I'm going to show you now, umm, Mr. Harik, Exhibit 2, page 6 of 43.

24   A.    Yes, I see that.

25   MS. CARTER:

26         All right, let the record reflect, ah, Exhibit 2 has been returned.

85

**VASYL HARIK**

1  Q.    Here it says, "Policy 8, Termination." Ah, the employer has indicated

2         that this was from a manual that you received. Did you not receive an

3         employee manual, sir?

4  A.    Yes, ah, I, I did receive a copy of the manual.

5  Q.    And was this, ah, in the manual? Did you read the manual?

6  A.    Ah, manual contains, ah, general, ah, guidelines about, ah, ah, what

7         the employee considers, ah, to be causes for, ah, terminate, for

8         termination.

9  MS. CARTER:

10        Can you hear him, Ms. Butziger?

11  MS. BUTZIGER:

12        No, I didn't hear that.

13  Q.    Okay, repeat your answer and speak up, sir.

14  A.    The, the manual includes general statement about the causes for

15        termination.

16  Q.    Do you dispute that this is in the handbook you received?

17  A.    No, I don't.

18  Q.    Okay. All right. All right, you heard the employer's testimony, what

19        we're going to do is go over the points at issue here. Ah, is it correct to

20        say you had a meeting with Mr. Srokowski on March the 10th?

21  A.    That's correct.

22  Q.    And was Mr.---

23  MS. BUTZIGER:

24        I didn't hear that. I mean, I'm not sure what, what's wrong, but I'm

25  not hearing.

26  MS. CARTER:

VASYL HARIK

1   Q.   All right, in that email, did it request a meeting the following

2        morning? I mean, I'm sorry, the following Monday morning?

3   A.   That's correct.

4   Q.   All right, and you said you did not read that email until when?

5   A.   Until next week---

6   Q.   When---

7   A.   After Monday. Ah, it was, ah, on Wednesday.

8   Q.   Why did you not, ah, check that email until Wednesday?

9   A.   Because the, I did not expect any, ah, response, ah, from Mr.

10       Srokowski that would affect my, ah, ah, current, ah, task that I was

11       working on. I was working on, ah, USRA task that required me to do,

12       ah, literature review, ah, of scientific journals and I was working on

13       that task, ah, ah, outside of my, ah, ah, Swales office, ah, per Swales

14       instructions.

15   Q.   Okay, when you received the email and you realized that he wanted to

16       meet with you Monday that had passed, did you make any attempt to

17       communicate with him?

18   A.   I got, ah, an email on, ah, ah, I read the email, ah, on Wednesday the

19       same day I got email saying that, ah, ah, what he wants in the first

20       and second email is, ah, to get the report covering my, ah, RCD task.

21   Q.   Did you get the emails at the same time or had, when you checked it

22       on Wednesday was there just one message from Monday or were both

23       messages there?

24   A.   Ah, I checked it, ah, it was one message at first and I was, ah---

25   Q.   Go ahead, sir.

26   A.   Ah, I was, ah, ah, thinking about, ah, the way Mr. Srokowski

**VASYL HARIK**

1      in Exhibit 2, page 7 of 43. Do you have that before you already, sir?

2  A.  Yes, I do.

3  Q.  Okay. Now, it says, ah, it looks like there's a response here from you

4      saying, "I am not refusing to meet with you." Did you ever meet with

5      him?

6  A.  Yes, I did. Ah---

7  Q.  Okay.

8  A.  I, I met, ah, with him, ah, on, ah, March 10th. We had a long meeting

9      where we discussed all the problems with my RCD task and about the

10     software delays. I provided information a, about those delays and

11     about the software and about the problems.

12  Q.  All right, did---

13  A.  And---

14  Q.  You meet with him, go ahead, sir. If you want to finish your answer,

15     go right ahead.

16  A.  And, ah, I had, ah, ah, phone communications with my immediate

17     super, supervisor, Vaughn Behun, after that.

18  Q.  Did you have any, did you meet with him after this March 30th email

19     was sent to you and you responded?

20  A.  No, I haven, I did not.

21  Q.  And is that because you said you had phone conversations with your

22     immediate supervisor?

23  A.  Ah, no, it's, ah, because, ah, Mr. Srokowski did not, ah, ah, respond

24     to that, ah, ah, to that answer. Ah, I said, "I'm not refusing, ah, to

25     meet with you," and he did not, ah, ah, schedule, ah, any meeting or

26     initiated preparation for meeting where we could, ah, address, ah, the

**VASYL HARIK**

1    Q.    Okay, if, explain the---

2    A.    Ah, my, ah, the employer representative refers to, ah, the sick leaves,

3          ah, that began in the, ah, late, ah, 2003 after I, ah, submitted, ah, an

4          accident report about, ah, ah, dust problem and the health issues

5          that I had afterwards. And after my doctor's visits, all of my sick

6          leaves were approved on a weekly basis by my immediate supervisors

7          as indicated in one of the time sheets. There is approval signature

8          and, ah, there were never, ah, concerns or, ah, issues raised about

9          the sick leave until after I started, ah, to complain about, ah, ah, until

10         I initiated my, ah, formal complaint activity on February 6 of 2004.

11         Ah, ah, next week, ah, of, ah, ah, it was February 9th or 10th, Ms., ah,

12         Butziger, ah---

13   MS. BUTZIGER:

14         Sorry, what?

15   A.    Ah, in the week of, ah, umm, February, umm, February 10th, ah,

16         something like that, ah, Ms. Butziger, ah, called, ah, me and left a

17         phone message, ah, saying that there are some, ah, concerns about,

18         ah, extensive, ah, sick leave. Ah, and so, umm, I did, ah, provide, ah,

19         ah, doctor's notes, ah, when it was asked. Ah, soon after my accident

20         report was, ah, filed, ah, in early September of 2003, ah, ah, a

21         manager, ah, asked me a question and I did reply about the

22         symptoms and the, ah, diagnosis of my doctor and then, ah,

23         (inaudible) when, ah, my supervisor asked about, ah, a doctor's note,

24         I also provided, ah, them, ah, Ms., ah, Butziger in February of 2004

25         said that since I, ah, overused my sick leave, ah, I, ah, cannot, ah,

26         use it any more. Ah, if I continue to have medical problem, I would

**VASYL HARIK**

1    have to go on, ah, disabil, I have to file medical disability. And, ah, at

2    that time, ah, since, ah, doctor had, ah, ah, no complete, ah,

3    confidence in, in his diagnosis of my problems, ah, I felt that, ah,

4    umm, I should, ah, ah, follow his recommendations and increase my,

5    ah, medicine dose, ah, to relieve my symptoms and, ah, ah, use my,

6    ah, annual leave hours, vacation time, ah, in, ah, in the case---

7   MS. BUTZIGER:

8    I'm sorry, I can't hear you.

9   A.    And, and use my vacation time instead of my sick leave when I have

10    medical problem. And I told that to Ms. Butziger---

11   Q.    All right.

12   A.    At that time. And, ah, that was, ah, acceptable to her as a plan.

13   Q.    Okay. Ms. Butziger has also testified that the employer requested a

14    list of needed software from you in March, ah, on approximately

15    March 3rd, 2003. Do you recall them requesting a list of required

16    software or software that you needed to perform your duties?

17   A.    Yes, ah, I, I do, ah, ah, recall that my, ah, ah, one of my supervisors,

18    Jo, John Mitchell, came up to me and requested, ah, ah, saying that,

19    ah, he needs, ah, a list of software that I need for my task and, ah, I

20    replied to him that there is no list, there is just one software that I

21    need, and that's the software that I've been talking about, ansys finite

22    element code, ah, and, ah, its EM model. The ansys (inaudible) code.

23    And that's all I need.

24   Q.    And was he the only one to request that list of software?

25   A.    Ah, yes, ah, ah, my, ah, ah, that's the only person who formally

26    requested that list, ah, we also talk about that, about the needed

VASYL HARIK

1    software with my immediate supervisor, Vaughn Behun, and, ah, I

2    also repeatedly told him, ah, ah, that all I need is, ah, the, the most

3    recent version of, of that code. And that's all I need. And, ah, ah, also

4    in my monthly reports, months after months I had been referring to

5    this code and these reports were submitted not only to the customer,

6    but also to my immediate supervisors.

7    Q.    Did---

8    A.    Ah---

9    Q.    Go ahead.

10   A.    Ah, my immediate supervisors, ah, were receiving these monthly

11         reports---

12   Q.    Speak up, sir.

13   A.    On regular basis.

14   Q.    All right, did Mr. Srokowski ever request a list from you?

15   A.    Ah, no, he did not request formally the list, ah---

16   Q.    Did he request informally?

17   A.    Ah, in our meeting on March, ah, ah, 10th or 11th, ah, we discussed

18         this, ah, software, ah, and he was aware about what type of software I

19         need for my task and we discussed the delays with this software and,

20         ah, what can be done to resolve, ah, these problems.

21   Q.    Did he request a list from you?

22   A.    Ah, no, he did not request a list from me. Ah, it, ah, looked like it was

23         clear to him that he knows what software I need.

24   MS. BUTZIGER:

25         I, I've lost him again.

26   Q.    Go ahead. It was clear---

102

**VASYL HARIK**

1   A.     It was clear, ah, it looked to me like it was clear from his comments

2           that he knows, ah, exactly what type of software I need for my task.

3           And that is the only software, there's no actual list of softwares.

4   MS. BUTZIGER:

5           Ms. Carter, is it possible to take a bathroom break?

6   MS. CARTER:

7           Sure, ah, the time now is 11:02. We will be in recess, how long do you

8   need? Is your bathroom close or do you got to walk out of the---

9   MS. BUTZIGER:

10         No, it's close.

11   MS. CARTER:

12         All right, we'll take a, ah, the time now is 11:02, we'll be in recess

13   until 11:10. Ah, there should be no conversation, umm, while we're in

14   recess. I will not disconnect the call, but I will re, ah, turn the recorder off.

15   MS. BUTZIGER:

16         Okay.

17   MS. CARTER:

18         The time now is 11:03, this hearing is hereby in, ah, recess. We'll

19   reconvene at 11:10.

20   MS. BUTZIGER:

21         Okay.

22   MS. CARTER:

23         Thank you. All right, the time now is 11:10 AM, this hearing is back

24   in session and I do need to change my tape to the second side. There

25   shouldn't, be no conversation while I do so.

26

VASYL HARIK

1                    **TAPE 2, SIDE 4**

2

3    MS. CARTER:

4         Let the record reflect I've changed my tape to the second side. Mr.

5    Harik, was there any conversation while I did so?

6    MR. HARIK:

7         No.

8    MS. CARTER:

9         You need to speak up.

10   MR. HARIK:

11        No.

12   MS. CARTER:

13        Ms. Butziger, was there any conversation while I did so?

14   MS. BUTZIGER:

15        No.

16   Q.   All right. Mr. Harik, ah, we were, ah, asking you questions. When you

17        were originally asked to submit a report, why did you not submit a

18        report of both your tasks and only one?

19   A.   The reason, ah, I submitted only a report covering, ah, RCD task

20        because our, ah, meeting with Mr. Srokowski on March 10th or 11th

21        was covering only RCD task and there was, ah, no reference of any

22        type to my second task that, ah, typically I wasn't reporting to Swales.

23        Ah, ah, because it was funded by USRA, I was submitting monthly

24        report to my immediate supervisor and, ah, Mr. Srokowski was, ah, a

25        supervisor for the, ah, entire, ah, RCD program, ah, which involved,

26        like, ah, many hundreds of people and he wasn't, ah, ah, usually

VASYL HARIK

1        supervising the other task. Ah, the other task was, ah, ah, funded by

2        a special contract made between USRA and, ah, Swales, ah,

3        headquarters in, ah, Maryland. And, ah, ah, to, ah, and, ah, on that

4        contract I was the principal investigator for the task and, ah, my---

5   Q.   Okay.

6   A.   My immediate supervisor wanted to have a monthly report but I don't

7        know whether he reported those reports to his, ah, supervisors.

8   Q.   All right. Did you have any prior warnings before, ah, discharge? Any

9        disciplinary action taken against you?

10  A.   No. I had, ah, no warnings, ah, for misconduct or unprofessional

11       behavior, ah, nor any, ah, ah, disciplinary actions. Ah, my, ah,

12       performance was, ah, cited as, ah, excellent, ah, and my monthly

13       reports were regarded as, ah, very detailed and, ah, they were done in

14       very professional manner and---

15  MS. CARTER:

16       All right. Now, I have here, ah, a document, I believe was submitted

17  by the claimant. It's a thirteen-page document, it has a, umm, cover sheet

18  on it, it says, "From Dr. Harik to Swales & Associate." The date is June 17th,

19  2004. At the bottom of the cover sheet it has, "Comments, Ms. Butziger." Did

20  you receive this document, ma'am?

21  MS. BUTZIGER:

22       Let, ah, let me see. This would have been, this is a fax, it came via fax

23  from your office, actually, yes, I think.

24  MS. CARTER:

25       All right.

26  MS. BUTZIGER:

105

**VASYL HARIK**

1        Yes.

2    MS. CARTER:

3        I'm going to show this to the claimant.

4    MR. HARIK:

5        Yes, I see that.

6    Q.    Okay, what, what is this, sir? What, umm, testimony, or, did you

7          want to give from this document here? What are these?

8    A.    Ah, ah, may, may I---

9    Q.    Go right ahead.

10   A.    Go over? On, ah, June 17, ah, I faxed these, ah, materials, ah, to Ms.

11         Butziger of, ah, Swales & Associates.

12   Q.    Okay.

13   A.    Ah, and the, these materials include, ah, my, ah, monthly reports

14         covering, ah, my, ah, both, ah, tasks that include, ah, nanostructures

15         or multi-functional materials research and, ah, RCD tasks. Ah, these,

16         ah, reports indicate, for example, in, ah, in September 2003, that I

17         was, ah, reporting, ah, continuing harassment by a senior NASA

18         engineer. I, I was reporting, ah, the continuing harassment to my, ah,

19         Swales supervisors and after that I was, ah, ah, continued to, ah, re, I

20         was con, I had been continuing to report, ah, the problems, ah, of a

21         similar nature and, ah, I'm surprised that, ah, ah, it wasn't reported,

22         ah, ah, neither to Mr. Srokowski or to, ah, Swales Human Resources.

23         Ah, ah---

24   Q.    Okay.

25   A.    It, it looks like a, ah, a Mr. John Mitchell who had that responsibility

26         to report these, ah, problems. He did not. Ah---

VASYL HARIK

1  Q.    Okay, what else, is that all that that is? Was there anything else in

2        there?

3  A.    Ah, the, the other reports, ah, covering the, umm, RCD task also, ah,

4        present the evidence that I had been reporting about the serious

5        problems about the software delays, ah, and they'd been continuing

6        on and on for months. I include just a few of the reports, ah,

7        November 2003 and then December 2003 and then, ah, January

8        2004 and so on and, and the, ah, the frustration and the level of

9        comments, ah, ah, was, ah, increasing as indicated in the reports.

10       Ah, there is also an email to, ah, Mr. John Mitchell, ah, in, ah,

11       response to, ah, his call about my, ah, ah, medical problems, ah, after

12       I submitted the accident report. And, ah, I, ah, ah, clarifying that the

13       status of my, ah, problems and information, ah, about the diagnosis

14       the doctor has and, ah, it indicates that I did report as soon as it was

15       requested and I provided clarifications and there were no other, ah,

16       issues or questions raised after that.

17             Ah, there is another email that marks the, ah, initiation of my,

18       ah, formal complaint process, ah, where, ah, I sent email to, ah, to

19       three individuals, ah, a Mr. Allen Waters, ah, Mr., ah, Vaughn Behun

20       and John Mitchell, ah, that, ah, the problems became, ah, ah,

21       extremely serious and, ah, I formally request to address them. And,

22       ah, another, ah, ah, email indicates that, ah, the, ah, Swales task

23       was, ah, ah, funded, ah, by USRA as indicated, ah, by email on, ah,

24       ah, February the 6 from, ah, Ms. Sophia Hill of USRA and, ah, that

25       was done with, ah, ah, Mr. Clarence Page of, ah, Swales headquarters

26       and, ah, the Swales headquarters, ah, ah, provide this, ah,

VASYL HARIK

1    information to, ah, my, ah, ah, manager, supervisors, Mr., ah,

2    Vaughn Behun and John Mitchell about, ah, ah, the task. And, ah, it

3    indicates that I have, ah, ah, enough funding, ah, to, ah, to work

4    until June 30th. Ah---

5    Q.    All right. Did you want, ah, this to be admitted as an Exhibit, sir?

6    A.    Yes, I do.

7    MS. CARTER:

8         All right. So this would be Exhibit 7, a thirteen-page document. I'm

9    also going to show to the claimant a part of Exhibit Number 2 of this buts,

10   ah, forty-three pages. These are documents that I believe were submitted by

11   the claimant, unless he corrects me. These are also the documents that the

12   deputy considered when making the determination. I believe the documents

13   the claimant submitted were from pages 22 to 43. Ah, for instance, this

14   says, "Progress report, Jan, January 2004."

15   Q.    Is this, this, a copy of what, the report you just went over, sir?

16   MS. CARTER:

17        I'm showing the claimant Exhibit 2.

18   Q.    Are these of a similar nature of what you just went over for me, or is

19        this something different?

20   A.    It, it's, ah---

21   Q.    Okay.

22   A.    One of the report, but, ah, this, ah, report doesn't, ah, include, ah,

23        the problems, ah, involving harassment, ah---

24   Q.    Okay.

25   A.    Ah, ah, and things like that.

26   Q.    All right. From those documents there, from that page up until 43,

**VASYL HARIK**

1      was there any particular testimony or evidence that you wanted to

2      give from those documents that you have in front of you? Exhibit 2.

3   A.   Ah, yes, ah, I would, ah, like to point out, ah, that, ah, it, ah,

4        includes, ah, ah, an email from Ms., ah, ah, Janice, ah, Hockenberry

5        of Mallett Technology that, ah, ah, shows the dates of, ah, software

6        delivery to, ah, ah, to the, ah, Hampton facilities. And it supports my,

7        ah, my statement that, ah, there were significant software delays.

8        Also, ah, this email was, ah, sent to, ah, the Swales Human

9        Resources and, ah, cc'd to Mr. John Mitchell and other supervisors.

10       Ah, and this email, ah, explicitly states, ah, the software that I need

11       for my task. Ah, other, ah, another email, ah, ah, just, ah, confirms

12       that I did, ah, ah, explain to Mr. John Mitchell, ah, about the nature

13       of my health problems.

14   Q.   And is John Mitchell, was he your supervisor?

15   A.   Yes, he was.

16   Q.   And who is Mr. Behun, or---?

17   A.   Vaughn Behun?

18   Q.   Behun, yes.

19   A.   Ah, he was my immediate supervisor, ah, he was a, ah, group

20        supervisors that I was---

21   Q.   Okay.

22   A.   Part of. And, ah, Mr. John Mitchell was my, ah, division, ah, head

23        supervisor.

24   Q.   Okay, go ahead.

25   A.   Ah, and, ah, this, ah, umm, file also includes, ah, an extensive report

26        about, ah, the availability of the finite element code ansys EM that I

VASYL HARIK

1       had submitted to, ah, Mr., ah, John Mitchell.

2   Q.   What date was that?

3   A.   Ah, it was, ah, in the middle of, ah, February. Ah, it was, ah,

4       February, ah, 19th or 29th, ah, along that time. Ah, and, ah, this, ah,

5       report, ah, details about, ah, the expansive software delays and, ah,

6       ah, it is, ah, expected, ah, ah, that, ah, ah, Swales supervisors would,

7       ah, address these, ah, ah, problems and that, ah, it also indicates

8       that, ah, ah, Swales supervisors, ah, did know the name of the

9       software that I, I need. And, ah---

10  Q.   You're going to have to speak up.

11  A.   And, and this extensive report also, ah, indicates that, ah, I had been

12      reporting these serious problems over and over again starting, ah,

13      from, ah, September 2002 and the problems were getting more and

14      more serious and, ah, ah, ah, Swales management, ah, ah, just, ah,

15      let it go and allowed the, ah, government, ah, representatives to, if

16      they don't raise concerns the, ah, the Swales management, ah, were

17      not going to address the concerns that raised by, ah, contractors,

18      employees like me. Ah, I also, ah, included, ah, my, ah, CD, ah, at the

19      end indicating that, ah, I had been, ah, working, ah, very hard and

20      I've been, ah, very diligent, ah, and, ah, ah, have, ah, the history of,

21      ah, a highly professional conduct, ah, and have been, ah, successful

22      in interacting with various people and, ah, carrying out, ah, various,

23      ah, ah, tasks. Ah---

24  Q.   All right, thank you.

25  MS. CARTER:

26      Let the record reflect, ah, he's returned Exhibit Number 2.

VASYL HARIK

1    already heard, Mr. Harik?

2    A.    Ah---

3    Q.    You'll be given a opportunity to give a closing statement.

4    A.    Ah, yes, I do, ah, how much time do we have?

5    Q.    Ah---

6    A.    About?

7    Q.    Well, I asked you that question, do you have any additional testimony

8          regarding what I just asked you.

9    A.    Yes.

10   Q.    Okay, very briefly.

11   A.    Okay. I, I just want to, ah, rate, ah, ray, reiterate the---

12   Q.    Uh-huh, no reiteration.

13   A.    Okay.

14   Q.    This needs to be new testimony we haven't heard so far.

15   A.    Okay. Ah, I want to state that, ah, there was, ah, no work-related

16         function that, ah, ah, was solved by, ah, the new proposed, ah,

17         meetings by Mr. Srokowski. And that I, ah, did response to, ah, to his

18         email, ah, scheduling the March 9th, 29th meeting and I did provide

19         the requested report on time. Ah, the Human resource person did not

20         provide any specifics in her testimony about the, ah, new nature of

21         the, ah, report requested and, and, ah, ev, even now it wasn't, ah, a

22         clearly defined what exactly what they, they wanted in the report. Ah,

23         I want to state that I had daily, ah, interactions, ah, or phone

24         messages, ah, for, ah, between me and my, ah, Swales, ah, immediate

25         Swales supervisor, ah, Mr. Vaughn Behun, ah, where I was stating

26         what I was working on and, ah, ah, where I was doing my work so I

120

VASYL HARIK

1    was, ah, adhering to, ah, to being, ah, making sure and, and giving

2    extra effort, ah, ah, to make sure that, ah, Swales managers were

3    aware of, of what I was working on and, ah, ah---

4    MS. BUTZIGER:

5    Hello?

6    Q.    Speak up, sir.

7    A.    I had daily interactions of phone messages, ah, to, ah, my immediate

8    Swales supervisor, Mr. Vaughn Behun, in which I made it clear, ah,

9    what I was working on and where I was working, ah, and the, ah, two

10    key meetings with Swales management were scheduled, ah, by phone

11    and when it was needed, Swales management did, ah, make just one

12    little extra effort to make sure that I did get messages and I did

13    receive them and responded to them on time. In my, ah, ah, first

14    email on Friday, ah, March 19th, which wasn't, ah, discussed much, I,

15    ah, did clearly state that, ah, that, ah, ah, Mr. Srokowski treatment,

16    ah, of problems and treatment of me was not professional and, ah,

17    ah, it was, ah, to exert pressure on me to stop the Equal Employment

18    Opportunity complaint at work and it is not, ah, normal or expected

19    behavior.

20    Q.    Sir, do you have anything to add that we have not heard so far?

21    A.    Ah, let me then just go over my notes to make sure. Ah, I want to, ah,

22    highlight that, ah, the situation with my, ah, complaint was, ah, and

23    complaints was a very serious and got very serious in great part due

24    to the Swales actions or inactions in the task.

25    Q.    Hold on one second before you continue. Go ahead, sir. Anything else

26    that we haven't heard so far?

121