

Arthur Leaderman
General Counsel
301-902-4489
aleaderman@swales.com

November 18, 2004

Terri L. Mattoon, Investigator
U.S. Equal Employment Opportunity Commission
Norfolk Area Office
200 Granby Street
Suite 739
Norfolk, VA 23510

Re: *Vasyl M. Harik; Statement of Position on Notice of Charge No. 121-2005-00090*

Dear Ms. Mattoon:

This correspondence constitutes the Statement of Position of Swales Aerospace in connection with the referenced Notice of Charge from Vasyl M. Harik dated October 22, 2004. Also submitted are documents and exhibits responsive to the EEOC Request for Information of the same date. It is our understanding that the Statement of Position may be shared with the Charging Party, but that none of the exhibits associated with the Request for Information requests shall be shared without our express permission.

*Statement of Position*:

*1. Dr. Harik's discharge for gross misconduct is supported by two administrative actions, including an on- the-record appeal.*

The Virginia Employment Commission determined by an initial administrative action dated May 7, 2004 and by a Decision of the Appeals Examiner dated July 25, 2004 after an on-the-record hearing that Dr. Harik was properly discharged for gross misconduct in accordance with *Va. Code* 60.2-618(2). The findings and conclusions of the Commission, which are annexed to this letter, note Dr. Harik's disrespect and "blatant disregard" of the reasonable requests of his employer. While the Virginia Employment Commission result is not necessarily a bar against Dr. Harik's further petition to the EEOC, please note that the findings and conclusions are based chiefly on Dr. Harik's own recorded testimony in a proceeding in which he did not have the principal burden of proof. The findings are evidence that the charge Dr. Harik's filed with EEOC is a self-serving, incomplete sketch that masks his own triggering actions in connection with the discharge and ignores his own responsibility to respond to the needs of his employer.



Terri L. Mattoon
U.S. Equal Employment Opportunity Commission, page 2

*2. Dr. Harik's charge is based on a pre- existing conflict with a third- party civil servant at NASA Langley Research Center, which Dr. Harik did not disclose to Swales Aerospace until his unrelated violations of company policy became an issue. Upon subsequent investigation, Dr. Harik's charges of national origin discrimination by a NASA civil servant were uncorroborated and based solely on his personal feelings and inferences.*

In 2003 Dr. Harik, a professional employee, began to take extraordinary amounts of undocumented sick leave. For the first six weeks of 2004, such leave averaged 32 hours per week. Annexed to this letter is the record of Dr. Harik's sick leave claims for 2003 and 2004. Dr. Harik was unresponsive, and defiant in his resistance to provide medical support for the sick leave. Swales Aerospace's concern over the undocumented sick leave related to its duty to maintain fair and consistent application of its policy. In addition, Swales had concern about the loss of funding for an assigned task from its customer NASA Langley Research Center if it could not verify that its assigned employee was mobilized and working. Swales was also conscientious in its effort to communicate to Dr. Harik a clear understanding of his right to good disability benefits if he needed any type of treatment and recuperation, but no avail.

Only when faced with the need to establish the bona fides of his extraordinary absence did Dr. Harik assert that he functioned in a hostile environment because of the alleged harassment of a civil servant, namely Dr. Tom Gates, a research employee of the government from the structural engineering section of the NASA Langley Research Center. Dr. Harik's bitter relationship to Dr. Gates was detailed to Swales in a chronology that Dr. Harik prepared and sent to Swales on March 3, 2004. It is annexed to this letter.

As the chronology in his EEOC charge states, Dr. Harik's concerns with Dr. Gates were *not* made explicit to Swales until February 2004. And as Dr. Harik's further disclosures make clear, a deep hostility toward Dr. Gates had broken out *before* Dr. Harik began his employment with Swales when he worked for another contractor on the Langley NASA site.

The work Dr. Harik performed as an employee *at Swales* did not depend on or require contact with Dr. Gates. Nor did Swales nor its employees otherwise work with Dr. Gates. Although Dr. Harik may view the matter differently, the longstanding, extracurricular hostility with Dr. Gates was not relevant to Dr. Harik doing his job for Swales. Indeed, from Swales's view point, when he worked, Dr. Harik's work was good. Dr. Gates was not a NASA monitor or supervisor of Dr. Harik's work.

Notably, Dr. Harik's monthly reports to Swales during his employment, when he submitted them, never cited Dr. Gates directly nor made references to comments or actions against him based on his national origin.



Terri L. Mattoon, Investigator
U.S. Equal Employment Opportunity Commission, page 3

Dr. Harik's charges are uncorroborated. They reflect Dr. Harik's intense sense of professional grudge, if not rage, connected with his professional competition with Dr. Gates, a person with whom Swales had no direct dealings or control.

No contemporary recordation of discriminatory comments provided to Swales, nor was there provided other corroborative evidence that any dispute he may have had pertained to Dr. Harik's national origins.

When Swales finally learned of Dr. Harik's allegations about disparagement because of national origin, it spoke with persons who worked in the technical branch area where Harik and Gates worked that would be likely to observe hostile action or words, if such occurred. No evidence of national origin discrimination could be discerned. Although Dr. Harik has freely characterized his differences with the civil servant to be based on Dr. Gate's feelings toward his nationality, nothing exists to support that view except Dr. Harik's feelings and characterizations. Notably, no direct words or actions have been reported to Swales by Dr. Harik *himself* that would suggest any issue that related to Dr. Harik's national origin. The animus of national origin hostility is inferred, never alleged with specificity.

To further demonstrate how Dr. Harik's claims of a "hostile environment" are unconnected to his employment at Swales, please note that in March 2004 Dr. Harik disclosed that *he believed* that Dr. Gates was responsible for his being discharged from an earlier job before his employment at Swales. He accused Dr. Gates of acting with malice by failing to credit him for his work in publications and presentations. He accused Dr. Gates of affirmatively discrediting him in front of others in alleged gatherings that Swales had nothing to do with and that were unrelated to the job performance that Swales sought from Dr. Harik. Dr. Harik's accusation of fraud, misrepresentation and hostility from Dr. Gates allege to stem from incidents beginning in May 2002, before Dr. Harik became employed by Swales.

Swales has *no* evidence that Dr. Gates has acted in bad faith toward anyone. The evidence does indicate, however, that this charge stems from an extracurricular grudge raised to deflect attention from the well-ground and validated findings of gross misconduct. If for argument's sake, Dr. Harik were correct about a bitter conflict between him and Dr. Gates, there is no reason to attribute that conflict to *national origin* in order to "judicialize" the personal conflict. A conflict between competing scientists need not be explained by national origin because one of the disputants insists on asserting that cause. Nor could Swales be expected to quell Dr. Harik's deep historical sense of feud, which Harik's own statements show as originating before he became employed by Swales.

In all respects Swales was respectful and responsive to Dr. Harik's safety and comfort. For example, in April 2003, Dr., Harik claimed that he was badly affected by an airborne substance in

5050 Powder Mill Road • Beltsville, MD 20705 • 301-595-5500 • Fax 301-902-4114 • www.swales.com



Terri L. Mattoon
U.S. Equal Employment Opportunity Commission, page 4

his office at the NASA Langley Facility. Swales promptly arranged for him to be provided a new office in a different building. Swales worked with the NASA facility safety coordinator to check for harmful conditions at the original location and survey other employees to see if there were like complaints. Tests for harmful particles were negative, but Swales nevertheless took advanced action to alleviate any concern that Dr. Harik had about potential harms that he suspected.

**3. Dr. Harik says he took his complaints directly to NASA in March 2003, (which is his right), but Swales was not even aware of his approach to NASA before being forced by Dr. Harik to react to the misconduct and sick leave abuse.**

Dr. Harik's chronology in his signed EEOC charge states that he made a formal complaint to NASA Langley's EEOC office in March 2003. Dr. Harik's charge to EEOC then suggests that Swales terminated him in response to his approach to NASA concerning a hostile environment. The inference of retaliation is vexatious. Swales had no knowledge of Dr. Harik's approach to NASA's EEOC office before his erratic work habits and excessive leave-taking became evident. To date, Swales is still not privy to the substance of Dr. Harik's communications to NASA Langley related to national origin discrimination nor to any charges related to his ongoing feud with Dr. Gates.

Dr. Harik is seizing the issue of Russian and Ukrainian heritage to: a) deflect from his already adjudicated, proper discharge for misconduct and b) to advance his interest in a feud with Dr. Gates. Dr. Harik has never accused Swales of national origin discrimination; his approach to NASA was not visible to Swales and in no way related to the independent misconduct that prompted the termination.

Accordingly, there is no basis to infer that national origin is at the root of his feud with a party over whom Swales exercises no control. Likewise there is no basis to hold Swales liable for discrimination or retaliation in the face of adjudicated findings of gross misconduct.

EEOC, as an agency, should refrain from joining as a party or being a sponsor to an action that is grounded in a pre-existing, longstanding feud between a properly terminated employee and a third-party civil servant who is in the good standing of another U.S. agency.

Sincerely,

Arthur Leaderman

cc: Pamela Butziger, Director, Swales HR/ encls/
     VEC decision;
     Sick Leave Data;
     March 3, 2004 memo from Harik re: Gates

*Confidential*

# Hostile Work Environment:
## Conflict, Problems and Harassment

Contractor: Dr. Vasyl Michael Harik, Swales Aerospace / Mechanics and Durability Branch.
Task: Evaluation of Multi-Functional Lightweight Structures[1]
Complaint against Dr. Thomas Gates, Senior Materials Engineer, MDB / NASA LaRC.

Reported on February 13, 2004 to Ms. Pam Butziger, Human Resources, Swales Aerospace.

**February 6, 2004:** The MDB Branch hosted a seminar by a distinguished professor from the Rice University (Dr. Boris Yakobson). Dr. Yakobson has been interacting with me from time to time as our published research on the shell models for carbon nanotubes are related. In the past, he had also been a contributor to an ICASE/LaRC edited volume on Nanoscale Mechanics. I was trying to arrange a meeting with him a few days earlier before his visit. However, the agenda or even a rough schedule was not provided to him by the POC for the visit, Dr. T. Gates.

Prior to the afternoon seminar at the branch, I was talking with Dr. Yakobson in Russian. Dr. Gates interrupted us, snubbing me and treating me as an empty place. The schedule for Dr. Yakobson's visit came up again in the conversation, but Dr. Gates brushed it off by saying "we'll play it by ear," so he can continue to maintain the control of the schedule and prevent unscheduled talks. By his behavior, he was showing "who has the power" and "whose wishes don't matter."

Still prior to the seminar at a distance, I've started to have a friendly chat with another visitor, who is a co-Director of the NASA-sponsored URETI Institute and is of Greek ethnicity. Dr. Gates, who is also the POC for that URETI, did not ignore me anymore but started to send these angry looks. I cut the conversation short and let the visitor go.

After the seminar and the first question, Dr. T. Gates has strangely left telling the speaker to come to his office shortly. As a result, after a couple of additional questions, Dr. Yakobson was compelled to catch up with the important "funding monitor," and we could not have a detailed discussion that was important for the two of my NASA-funded projects.

**December – February:** After receiving the new version (8.0) of the ANSYS-EM code in December, Dr. T. Gates (as the ANSYS support coordinator at the branch) has withheld the code and the information about its availability until now. The new version has significant improvements in the code multifunctional capabilities that are important for the task.

During an intense period of the on-going resolution of software problems in the finite element code ANSYS-EM-6.1, Dr. Gates's contractor (who is aware of the conflict and is dependant on Gates for funding) displayed low interest and lack of cooperation with the ANSYS technical support and me. The contractor works with the newer ANSYS-EM-7.0 for several months.

Other NASA contractors seem under pressure to either avoid any contact or take sides.

---

[1] *Task description*: A validation of analysis methods investigating the mutual influence of functionalities will be performed. The finite element code ANSYS and other codes with multifunctional capabilities provided by the Government will be utilized in the analysis effort. The geometric and loading characteristics of plate and shell structures will be simulated. The static and dynamic response of multifunctional structures (with and without damage) will be investigated.

**November, 2003**: The on-going conflict was touched upon briefly with Dr. Damodar Ambur, Branch Head/Technical Monitor. There was no desire to discuss the details: it looked like there was not much he could do to resolve the problem. There are "more things that can be done with a contractor" if problems continue. In the branch, only Dr. Gates and his two contractors may work on issues concerning nanostructured materials (for "program consolidation" purposes).

**August, 2003**: The Annual NASA-URETI Workshop and Review was attended by many distinguished professors from Princeton, Northwestern and other universities. A disturbing public-relation incident was caused by Dr. T. Gates's remarks about my work. During the NASA-URETI Review, Professor Ted Belytschko has presented a slide with a summary of my earlier work. The slide included two formulae that I've developed for nanotube/polymer effective viscosity and friction, a figure of an MD unit cell from our work with Dr. Sarah Frankland (with background on publications), three small figures on nanotube classes from my earlier work and how those nanoscale models now can be related to different nanotube classes.

Dr. Gates was well aware of "when, what and who" w.r.t. those results. He said that those results should not been included (not even as important background) because it was part of the NASA program (*no, it was a part of ICASE research*). After he got corrected for misinterpreting the nature of URETI cooperative agreement with NASA, he "came back" with **a damaging misrepresentation** that the slide is "Sarah's work" and she is not aware of its content.

1) The slide was based on either predominantly or solely on my work done both earlier and recently per URETI request; Dr. Gates's cavalier treatment of authorship was disturbing! For the MD Fig, I gave plenty of credit to Dr. Gates' contractor, Sarah Frankland, on the slide including her, our and other earlier background publications (per URETI instructions).

2) During the past year, our interactions with Sarah have been actively discouraged by Dr. Gates. This has prevented us from completing an important piece of research.

3) Ironically, the next day, Dr. S. Frankland has presented three slides that are based on our earlier work. The slides did not include specific credits - just general. I had no comments both times in order to avoid fueling the obvious tension and negativity nor I've mentioned that I also was not aware of the content of the slides.

*Dr. Gates has used his position as a member of the NASA-URETI Review Board, to harass me, now in public, for personal and parochial reasons. Professionally speaking, his continuing derogatory remarks obstruct my interactions with my colleagues during the course of my work. His behavior has caused a lot of emotional anguish, damaged my professional standing among colleagues and made my work much more difficult. There seems to be a deep misunderstanding about appropriate norms for technical authorship, professional credit and treatment of contractors as one may from the following.*

This is not the first incident of this sort with Dr. T. Gates.

- During the 1st URETI-NASA meeting in November 2002, he presented a slide or two on our work with Sarah Frankland on the NT pull-out without my name at all - anywhere.

*Confidential*

- It is hardly a coincidence that in the following December 2002 and March 2003 Sarah felt compelled to have two conference presentations, which were based on our work without me as a co-author. It was an agonizing decision for her as Dr. Gates's contractor.
- In their AIAA SDM conference talk last April 2003, Dr. Gates and Sarah had presented a part of our results without any mentioning of my name.

I did complain to Dr. Ambur about this before (March 2003) in hope that things will cool off, but they are still coming up. Now my on-going working relations have been affected beyond Sarah. I don't want such incidents to disrupt my work.

Reported on August 21, 2003 to Dr. Damodar Ambur, Branch Head/Technical Monitor.
Reported on August 29 and September 29, 2003 to Mr. John Mitchell, Swales Supervisor.

**May 2003**: Dr. T. Gates has been putting pressure on other NASA engineers and NASA contractors who have requested my technical assistance in preparing a NASA C&I Proposal. He has also presented a negative picture to my NASA technical monitor, Dr. Ambur. After not being successful (as the collaboration went on), he had used his position in August as a member of the C&I Review Panel to downgrade the merit of the proposal on new modeling methods for materials processing.

**October 2002 – April 2003**: Other on-going problems with availability of the ANSYS-EM code that are directly impacting my daily task work have been reported separately. The ANSYS-EM code was shipped to Dr. T. Gates (as the branch ANSYS support coordinator) in September 2002. The code was made available ONLY the next year after an important annual conference and a series of complaints. The task technical lead (Lockheed Martin) and the NASA technical monitor had been regularly informed of the situation.

**May 2002**: Dr. Gates has misrepresented my technical output to the Branch Head and abruptly without any warning has pulled out my funding in the middle of a fiscal year. His actions had led to a loss of my position at the ICASE Institute at NASA LaRC.
   After complaints about the loss of my job and several discussions with supervisors, I'd been offered a position with the Lockheed Martin team, which technically leads my current task. However, some members of the team had been working closely with Dr. T. Gates for years in the 1205 Lab. Not surprisingly, I was denied a position with Lockheed Martin, because of "the limit on the number of employees," and got transferred to Swales. Ironically, a couple of months later Lockheed Martin hired another less experienced (but home-grown) employee for similar work.

Prior to that event, Dr. T. Gates and me had some disagreements concerning openly raising questions and discussing limitations of new nanoscale models, the credit issues with respect to various activities and publications (ICASE technical reports, organizing and chairing conference sessions, etc.), as well as the treatment of me, a foreign-born contractor, as compared to others.

*Dr. T. Gates was successful in firing me once. It looks like he wants to do it again by sabotaging and discrediting my work as well as fostering a hostile environment around me.*