300C Richardson Run
Williamsburg, VA 23188

June 21, 2004

Ms. Brenda Manuel-Alexander, Director
Discrimination Complaints Division (Code EC)
Office of Equal Opportunity Programs
NASA Headquarters
300 E Street, SW
Washington, DC 20546-0001

RE: A Formal Complaint of Discrimination

Dear Ms. Manuel-Alexander,

On March 18, after a series of consultations with the NASA LaRC EEO Program office since February 6, the local Swales management since the week of February 9, and Human Resources of Swales & Associates since February 13, I have submitted an EEO complaint of discrimination based on the national origin, harassment and hostile work environment. While initially the Swales HR and management were supportive of my EEO complaint activities (in contrast to the NASA Technical Monitor), their support was withdrawn soon after a semiannual NASA review panel (involving the NASA Tech Monitor) of the Swales contract around February 18. The hostile work environment and harassment had spread then to my new office at the Swales facilities at LaRC. After a series of new aggressive denials of any problems whatsoever and unsuccessful pressuring to stop the complaint process, the Swales management has found a questionable cause based on distorted evidence and strained reasoning to fire me on April 5, under apparent pressure from the NASA personnel. I believe that I have been discriminated against and suffered a reprisal for prior EEO activity at NASA LaRC.

I have to disagree with the conduct of a limited inquiry to gather information whether I, as a NASA contingent worker, was an "employee" of NASA within the meaning of the Federal Sector EEO process. The conclusion that the "employee" jurisdiction "does not appear to be supported after consideration of the 15 factors for the Contingent Worker Determination" is based on the information provided by the NASA Technical Monitor, who is named in the EEO complaint as a participant, and the Swales managers, who have been denying any problems for more than a year despite the reported evidence.

I believe that my case is appropriate for the EEO processing as a contingent worker, because of the reasons listed below. First, I have to correct the wording of my key statements to the EEO counselor. In particular, my prior "removal from employment by another contractor was due" primarily (not "in part") "to the influence of **Dr. Thomas Gates**" of NASA LaRC. Dr. Gates has denied me access to and grossly misdirected the critical resource (a computer software) needed to perform my job at the NASA branch.
   As far as the answers to the 15 factors for the contingent workers, I have the following corrections:

- **1st factor**: NASA did control when, where, and how I performed my job. I was placed to work within a branch building next to NASA personnel, and was moved twice by NASA. I was expected to mostly work between 9 a.m. and 4 p.m., and I was often directed by NASA personnel how to perform my job. The later was often accompanied by the abuse of power (see Appendix).

- **6th factor**: NASA did have the right to assign additional projects to me, and did use it several times. I was abruptly directed to start working in the new area of nanotechnology in 10-11/2000; I was to repeatedly assist the nanotube-interface-modeling efforts in 9-12/2002, the ANSYS-based

*Formal Complaint by V. M. Harik*
*June 21, 2004*

visualization of the Airbus tail model in 8-9/2003, and the new structural-optimization-grant efforts in 4, 9-12/2003.

- **7th factor**: The NASA personnel made it clear what were the appropriate hours of work. Any significant changes in the pattern of working hours had to be cleared with the NASA Tech Monitor first (such practice was reinforced by the formal contractor supervisors). Duration of the job on a specific task was controlled by the NASA Tech Monitor (see Appendix).

- **9th factor**: Swales Aerospace had played no role in providing any technical assistance required for the job. It also did not hire any assistants. Most of the assistance received for the job was ether directed or controlled by NASA. NASA also paid for my training on the ANSYS software.

- **12th factor**: The NASA Tech Monitor had control over the use of the worker's benefits such as annual leave. If the leave was supported by NASA, the formal contractor supervisor would "rubber stamp" it.

- **14th factor**: The NASA Tech Monitor and the NASA branch head can discharge the worker. This has been done in the past in the case of employment with the ICASE Institute at NASA LaRC (see Appendix). The NASA branch head controlled and directed the hiring, the salary raises and the firing. I believe that the NASA branch head/Tech Monitor had facilitated the latest firing as well.

- **15th factor**: The NASA branch head believes in creating the employer-employee relationship by interviewing the new candidates, repeatedly using references such as "NASA contractor employees are a part of the NASA branch" or "a part of the family", enforcing the branch internal rules on the contractor employees, etc. I often had no choice but follow this approach.

As the result, I do believe that my case is appropriate for the EEO processing as a contingent worker. The misinformation provided by the NASA Tech Monitor about the above factors amounts to a cover up.

After receiving a copy of the EEO Programs letter of May 14, 2004, I have attempted to contact your office and have later contacted the **NASA LaRC Ombudsman, Mr. G. Watson**. After reviewing my initial EEO complaint, Mr. Watson indicated that the problems described are appropriate for the EEO Programs, and he would direct it again into the EEO Programs framework.

I thank you for your time and consideration.

Sincerely,

*V M Harik*

Dr. Vasyl Michael Harik
Former Senior Structural Engineer
Mechanics and Durability Branch
NASA Langley Research Center
Swales Aerospace contractor for NASA projects

Appendix: see pp. 3-8.

2

**The first hiring by NASA (2000)**: I was hired by Dr. Damodar Ambur, the head of NASA Mechanics and Durability Branch, in October of 2000 after visiting LaRC in the summer of 2000 and interacting with him later by e-mail (CV, etc.). Paperwork and the formal hiring were done through the ICASE institute in September 2000, once Dr. Ambur made a financial commitment to the ICASE.

In August of 2000, Dr. Ambur wrote my task description involving failure theories for composite materials. In October, during my first week on the job as an ICASE Stuff Scientist, the direction of my work had been dramatically re-directed by Dr. Ambur toward Nanotechnology and Carbon Nanotubes, as my focus. I was also strongly discouraged by him to spend any time on the composites failure research. My ICASE formal supervisor, Dr. Manuel Salas, had no say in these drastic changes.

### An earlier directing and misdirecting of my work by NASA personnel:

**10/2000 – 3/2001**: After a literature review, I had proposed to Drs. Ambur and Gates of NASA to evaluate the beam and shell models for carbon nanotubes. In January '01, I had completed an ASME conference abstract on the shell models and submitted it, after a review with Drs. Gates, Ambur and Nemeth of NASA. The ICASE was not involved again.

As my report was getting bigger, I was directed by Dr. Gates of NASA to separate the beam and the shell parts of the paper. Such a split was also good for setting up two tracks -- two reports: one on the shell models with my slow-to-contribute NASA co-authors and another on beams that I could handle myself. I wanted to reduce the micro-management of my writing (this was not my first research paper) and try to avoid demeaning intrusion into my work, which amounted to mainly the "language police," contrary to my expectations. Such interactions were obstructing my work rather then supporting or helping it.

**5/2001**: During our pre-conference meetings, I was frustrated by the disproportion between the "format policing" and micro-management along with demeaning comments and the lacking technical input from my NASA co-authors. During one of the meetings, Dr. Nemeth said "now, we've broken your spirit so you'll do what we tell you."

**Summer 2001**: Once the LaRC first conference presentations on nanostructured materials had been completed, the planning of new conference sessions for the 2002 AIAA SDM Conference had began. Dr. T. Gates assigned only his PostDoc, Dr. Gregory Odegard, and Dr. Ed Glaessgen of NASA to organize and lead the new sessions, although I was also interested and had appropriate experience. Dr. Glaessgen had later included me to help the informal organizing committee, and this was reflected in an official call for papers, but Dr. T. Gates had been repeatedly excluding my name when referring to these activities during the group meetings.

Such behaviors of Dr. T. Gates communicated (to me and my colleagues) that my input and my contributions are neither welcomed nor needed. Such treatment was socially and bureaucratically abusive.

**9 – 12/2001**: After one of Dr. Gates' associates left the group, I was moved by NASA next to Dr. Gates' office in the room with his PostDoc. In daily interactions, the favoritism toward his PostDoc, on one hand, and the condescending reservations toward me, on the other hand, became the norm as the AIAA conference abstracts were reviewed and the talks organized into the sessions. Other activities were handled similarly.

After a very successful organization of conference sessions on nanostructured materials, Dr. E. Glaessgen of NASA and I started to discuss a follow-up publication of extended papers. Dr. Gates took over our well-grounded plans and categorically rejected our request to participate in co-editing such a publication (a special journal issue). A proposal to develop another complementary publication was

*Formal Complaint by V. M. Harik*
*June 21, 2004*

strongly discouraged (thus, pressuring out such opportunities). Dr. Gates said that only he, as the program manager, may do such a thing.

**1 – 3/2002**: Dr. T. Gates had pushed a mid-year salary increase and a promotion to a Staff Scientist for his 1.5 year-old PostDoc, contrary to the standard practice. I got an adjustment to my yearly salary increase only after raising this issue with my NASA branch head, who was pleased with my work according to the ICASE mid-year review that followed.

I had waited one year for any technical input from Drs. T. Gates and M. Nemeth or at least a paragraph of writing for the AIAA paper on shell models. After one of my requests, Dr. Nemeth suggested to hold up the paper. I wanted to proceed with publication, so I told Dr. M. Nemeth that his name could be removed from the AIAA paper if he cannot contribute at least some writing on time. He made a scene in my office with derogatory language pushing for his directive.

I had been also working with Dr. Sarah Frankland on developing computational and analytical simulations of the nanotube/polymer interface and an MRS Symposium paper. The results were quite good. When it became clear that Dr. T. Gates was not going to be a co-author, he started to slander my modeling work as trash, disaster, etc. This way, he directed and controlled evaluation of my work.

**5/2002**: After I wrote an extended SEM conference abstract on the nanotubes-based scanning probes, I let Dr. T. Gates to polish the draft as a co-author and submit it to the Society of Experimental Mechanics. Later I found out to my surprise that Dr. Gates put his name first in the list of authors for the SEM program of talks.

Later in early May, Dr. T. Gates grossly misrepresented my technical productivity to the NASA branch head, Dr. Damodar Ambur, and argued to withdraw my research funding from the ICASE institute due to poor technical performance. Dr. Ambur had talked to me, but he supported his senior engineer in the dispute without carrying out a more detailed or balanced investigation. As a result, my standing in the branch had plunged.

In the middle of May, Dr. D. Ambur had called the ICASE Director, Dr. Manuel Salas, told about the withdrawal of funding and the termination of my task. Dr. Salas sent me a letter of termination. Dr. T. Gates' actions had directly led to a loss of my position at the ICASE Institute at NASA LaRC.

***Dr. T. Gates of NASA was successful in firing me once. Now he had done it again by sabotaging and discrediting my work as well as fostering a hostile environment around me. His NASA branch head, Dr. D. Ambur, unfortunately, had supported him in this process.***


**The second hiring by NASA (2002):**

**June, 2002**: After complaints about the loss of my job and a brief investigation, Dr. D. Ambur offered me a position under the SAMS contract with the Lockheed Martin team, which became my technical lead for my latest task. However, some members of the SAMS team had been working closely with Dr. T. Gates for years in the 1205 Lab. Not surprisingly, I was denied a position with Lockheed Martin, because of "the limit on the number of employees," and got transferred to Swales. Ironically, a couple of months later Lockheed Martin hired another less experienced employee for similar work.

The process of hiring was as follows: Dr. D. Ambur of NASA told me that he will write a new subtask for my modeling work in the SAMS contract, for which he was the NASA technical monitor. He also told me to send my resume quickly to Ms. M. Swain of Lockheed Martin, first, and, after the delay, to Mr. A. Srokowski of Swales Aerospace. I was hired by Swales under Dr. Ambur's directive for the Lockheed Martin materials task in the SAMS contract.

With the new position at Swales Aerospace, I had lost some benefits, research credits for new findings and the opportunity (although restricted) for semi-independent research. According to the SAMS contract, NASA branch owns everything what I had produced under this contract, so there is no question

4

*Formal Complaint by V. M. Harik*
*June 21, 2004*

of authorship and research credits. But even this was not enough for Dr. T. Gates as he later started to lay claims for my past work and misdirect the critical resources for my work as a Swales/NASA contractor.

### The latest directing and misdirecting of my work by NASA personnel:

**7 – 8/2002**: Representatives of an ANSYS-code distributor, Mallett Technologies Inc., had been called upon to upgrade the license. During one the on-site meetings arranged, Dr. D. Ambur (NASA Branch Head) had questioned a comment of my former student and a Mallett employee about me working for his branch as a good thing. The derogatory comment "Is it good or bad?" left a bad impression.

Dr. Nemeth, the Asst. Branch Head, had "lost" the May-June review material for my paper with Dr. Sarah Frankland on the stress-strain curves for nanocomposites and forced a second review that had delayed the "ready version" of the paper. This had effectively reduced our visible productivity.

After the "firing" from ICASE, I was still in the same office with Dr. T. Gates' contractor and across the hall from his office. In the branch, NASA contractors and civil servants started to treat me differently, either with reservations or avoiding a "problem employee." The socially hostile treatment by Dr. Gates had also started to affect my work with one of his contractors, Dr. Sarah Frankland,

In my task, there was a lack of database for multifunctional material properties and understanding of magneto-mechanical analyses that were based only on normalized materials properties. My attempts to resolve this and to develop collaborative relations with contractors from the Advanced Materials Processing Branch were discouraged by Dr. D. Ambur as it was perceived as the role of Dr. Gates team.

**9 – 10/2002**: In September, as the ANSYS-code coordinator for the branch, Dr. T. Gates had received the multiphysics upgrade of the NASA-owned mechanical license for the ANSYS finite element code. The code was critical for my task (as was clearly stated in the task description), yet, my access to the upgraded code had been denied by Dr. Gates.

I had planned a meeting with the ANSYS vendor representatives to speed-up the multi-user arrangement for the in-coming software, but Dr. D. Ambur called a meeting (as my NASA technical monitor and the Branch Head) and identified Dr. T. Gates as the only point-of-contact (POC) who will be responsible for talking with the ANSYS vendor and will direct the transfer of Multiphysics module to a UNIX machine with multi-user capabilities. I should just wait.

During the same meeting in early October, I was pressured to cancel my ASME conference talk, which was planned earlier, and drop the opportunity to chair two conference sessions otherwise I'll lose my job/contract again. I complied to avoid loosing job again, but the cancellation made a bad impression at the conference. The meeting was extremely stressful and humiliating. After the meeting, I spent my Saturday at the hospital.

Later in the month, the Acting Branch Head, Dr. M. Nemeth was walking with me in the parking lot at the branch and said: "you should off been the plumber – this place is going to drive you crazy."

**11 – 12/2002**: The multiphysics upgrade of the mechanical license for the ANSYS finite element code has been still delayed along with a transfer of a PC-based ANSYS Multiphysics license to a server with multi-user capabilities. I'd periodically reported my concerns to my NASA technical monitor, Dr. Ambur, but there was no result. The code was in the branch, but was withheld by Dr. T. Gates of NASA. As a result, my task progress was dramatically affected, as was I by the unfair treatment.

During a local URETI/NASA LaRC Workshop, Dr. T. Gates had presented a review of my past research with his contractor, Dr. S. Frankland, without mentioning my name anywhere. The room was full of distinguished university professors and my colleagues, who got a bad impression.

Under pressure from Dr. Gates, his contractor Dr. S. Frankland had dropped my name from a conference talk in December, which was largely based on our mutual research as part of the ICASE institute. It was an agonizing decision for her as Dr. T. Gates contractor. Right after her final e-mail, Dr. Gates came to my office with a brief pointed comment: "I had a very productive day!"

5

*Formal Complaint by V. M. Harik*
*June 21, 2004*

**1 – 2/2003**: The original task-based AIAA Conference paper had to be dramatically revised in order to de-emphasize the ANSYS-based finite element modeling in favor of an analytical approach. The ANSYS Multiphysics module had been still unavailable due to Dr. Gates' misdirection of this critical resource. Again, it did not look good (for my task performance and the impression of research community).

Once again I reported the problem to my NASA technical monitor, Dr. D. Ambur, and the task technical lead. Dr. Ambur promised to talk with Dr. Gates, but there was no result as before. The situation was very stressful and felt hopeless.

**March 2003**: Discussions with the NASA technical monitor, Dr. D. Ambur, had been held concerning the urgent need for ANSYS EM-Multiphysics module for the task multifunctional analysis. Communications concerning time delays, a half-implemented purchase order, and interaction with the branch POC for ANSYS, Dr. Gates, had been summarized. A five-options plan had been proposed. The NASA technical monitor/Branch Head, Dr. Ambur, had promised to renew efforts with the ANSYS POC, Dr. T. Gates.

Under pressure from Dr. Gates, his contractor Dr. S. Frankland had dropped my name again from an APS conference talk, which was largely based on our mutual research as part of the ICASE institute. I'd complained, but Dr. Ambur and my technical lead were not interested in addressing the problem.

**April 2003**: Transfer of the ANSYS-EM code from a PC to a multi-user UNIX machine had been completed ONLY after the key AIAA conference, where I was supposed to present the task-based results. My performance evaluation was saved only by a recent creation of novel model for multifunctional plates. Dr. Ambur was the first author on the corresponding conference paper.

In their AIAA SDM conference talks, Drs. Gates and Frankland had presented a part of our results from earlier work at the ICASE institute without any mentioning of my name.

Modeling-for-design of multifunctional structures requires many electromagnetic material parameters including ranges of their values, as well as their dependence on morphology, temperature and electric/magnetic fields. Coherent closer interactions with materials researchers working with multifunctional materials were needed to ensure the use of prior technologies and save time. Drs. Gates and Ambur had strongly discouraged such close interactions in my small complementary URETI project.

**5 – 7/2003**: Since the ANSYS-EM code had been moved to the multi-user UNIX machine, its use had increased dramatically, and, hence, there was a need for at least an additional ANSYS PRE/POST processor. All relevant information has been provided to Dr. Ambur, but Dr. Gates blocked the purchase.

A NASA-NIA contractor, Dr. B. Diskin, had requested some help and guidance with the writing of a short NASA C&I proposal on the modeling of materials processing. Drs. Gates and Ambur put considerable pressure on the people involved to eliminate this opportunity to help my colleagues. Dr. Gates presented a negative picture to Dr. Ambur, who told me: "bad impressions can hurt you."

**August 2003**: At the Annual NASA-URETI Workshop and Review (which was attended by many distinguished professors from Princeton, Northwestern, etc.) a disturbing public-relation incident was caused by Dr. T. Gates's pressuring remarks about my work. During the NASA-URETI Review, Professor Ted Belytschko has presented a slide with a summary of my earlier work. The slide included two formulae that I've developed for nanotube/polymer effective viscosity and friction, a figure of an MD unit cell from our work with Dr. S. Frankland (with publications info), three small figures on nanotube classes from my earlier work and how those nanoscale models now can be related to different nanotube classes.

Dr. Gates was well aware of "when, what and who" w.r.t. those results. He said that those results should not been included (not even as important background) because it was part of his NASA program (*no, it was a part of ICASE research*). After he got corrected for misinterpreting the nature of URETI cooperative agreement with NASA, he "came back" with **a damaging misrepresentation** that the slide is "Sarah's work" and she is not aware of its content.

6

*Formal Complaint by V. M. Harik*
*June 21, 2004*

1) The slide was based on either predominantly or solely on my work done both earlier and recently per URETI request; Dr. Gates's cavalier treatment of authorship was disturbing! For the MD Fig, I gave plenty of credit to Dr. Gates' contractor including her, our and other earlier background publications (per URETI instructions).

2) During the past year, our interactions with Sarah had been actively discouraged by Dr. Gates. This had prevented us from completing an important piece of research.

3) Ironically, the next day, Dr. S. Frankland had presented three slides that were based on our earlier work. The slides did not include specific credits - just general. I had no comments both times in order to avoid fueling the obvious tension and negativity. I also did not mention that I was also not aware of the content of the slides.

I reported this to my NASA technical monitor, Dr. D. Ambur, including the notes:

*Dr. Gates has used his position as a member of the NASA-URETI Review Board, to harass me, now in public, for personal and parochial reasons. Professionally speaking, his continuing derogatory remarks obstruct my interactions with my colleagues during the course of my work. His behavior has caused a lot of emotional anguish, damaged my professional standing among colleagues and made my work much more difficult. There seems to be a deep misunderstanding about appropriate norms for technical authorship, professional credit and treatment of contractors as one may from the following.*

This is not the first incident of this sort with Dr. T. Gates, but Dr. Ambur was reluctant to address it.

**10 – 11/2003**: NASA technical monitor, Dr. Ambur, had been briefed about the on-going delays in correcting an error in the magnetic force macro of the ANSYS-EM-6.1 code. Help in dealing with the ANSYS vendor in resolving this problem and clarifying the timeline had been requested. The ANSYS POC, Dr. Gates, did not provide any comments or assistance. In fact, he had received the newer version 7.0 of the code with updated multifunctional capabilities from the vendor, and withheld it from me, while his contractor had access to it. I felt stressed out, frustrated and depressed.

The conflict with Dr. Gates was touched upon briefly with Dr. Ambur, Branch Head/Technical Monitor. There was no desire to discuss the details: it looked like there was not much he could do to resolve the problem. There were "more things that can be done with a contractor" if problems continue, he said. In the branch, he added, only Dr. Gates and his two contractors may work on issues concerning nanostructured materials (for "program consolidation" purposes). The luck of support felt awful.

**December 2003**: Existence of new software bugs in the ANSYS-EM code had been identified with help of an NIA contractor, Dr. G. Odegard (e.g., ANSYS-Multiphysics commands for calculating electric and electromechanical energies of multifunctional materials). This information had been withheld earlier, but now provided to me after my request. I had forwarded it to the ANSYS technical support, so the software problem can be corrected in the FEA code used by NASA engineers, and, thus, errors in various on-going designs can be avoided at NASA and beyond. Dr. Odegard (T. Gates' contractor) displayed little interest in further cooperation needed to fully resolve the problem per ANSYS-vendor repeated requests.

Dr. T. Gates, as the ANSYS POC and the code coordinator, had received the newest version of the ANSYS-EM code (v. 8.0) with significant improvements in multifunctional capabilities, but again withheld it from me, obstructing my task work as the deadline for results moved very close.

A review of my work on the NASA-sponsored URETI for Multifunctional Materials was dropped out by the URETI Director in his LaRC talk after the negative pressure displayed earlier by Dr. T. Gates.

**January 2004**: The earlier detected software bug (malfunctioning ANSYS-EM magnetic-force macro for magneto-structural finite element analysis) had been re-classified by the ANSYS vendor as absence of capability and work-in-progress. In order to correct this deficiency with alternative ANSYS macros

*Formal Complaint by V. M. Harik*
*June 21, 2004*

based on the code programming language, a need for a purchase request for the corresponding software manual had been communicated to the NASA technical monitor, Dr. Ambur, but delayed again.

Excessive delays with the availability of an FEA code (i.e., ANSYS-Multiphysics, which was essential to my task) had been experienced for more than a year now. The loss of an initial purchase order (as I was told) and withholding of the purchased code and its newer versions for months by the branch POC for ANSYS had been reported. Now a lack of cooperation in resolution of the recent delays had re-surfaced the old problem of inter-group friction and harassing behavior that had not been resolved.

Academic collaborators of URETI team (NASA-sponsored URETI for Bio/Nano Multifunctional Materials) had shown distressful signs of negative pressure (promoted recently by Dr. Gates). A dramatic cut in my URETI project funding had been in the implementation stage without an open discussion.

**February 6, 2004:** The MDB Branch hosted a seminar by a distinguished professor from the Rice University (Dr. Boris Yakobson). Dr. Yakobson has been interacting with me from time to time as our published research on the shell models for carbon nanotubes are related. In the past, he had also been a contributor to an ICASE/LaRC edited volume on Nanoscale Mechanics. I was trying to arrange a meeting with him a few days earlier before his visit. However, the agenda or even a rough schedule was not provided to him by the POC for the visit, Dr. T. Gates.

Prior to the afternoon seminar at the branch, I was talking with Dr. Yakobson in Russian. Dr. Gates interrupted us, snubbing me and treating me as an empty place. The schedule for Dr. Yakobson's visit came up again in the conversation, but Dr. Gates brushed it off by saying "we'll play it by ear," so he can continue to maintain the control of the schedule and prevent unscheduled talks. By his behavior, he was showing "who has the power" and "whose wishes don't matter."

Still prior to the seminar at a distance, I've started to have a friendly chat with another visitor, who is a co-Director of the NASA-sponsored URETI Institute and is of Greek ethnicity. Dr. Gates, who is also the POC for that URETI, started to send angry looks. I cut the conversation short and let the visitor go.

After the seminar and the first question, Dr. T. Gates has strangely left telling the speaker to come to his office shortly. As a result, after a couple of additional questions, Dr. Yakobson was compelled to catch up with the important "funding monitor," and we could not have a detailed discussion that was important for the two of my NASA-funded projects.

**February 2004**: Further information on malfunctioning commands had been requested by the ANSYS technical support. It had been communicated to the Dr. Gates' contractor and the NASA technical monitor; however, no help was provided.

The task-based AIAA SDM04 conference paper had to be cancelled due to the ANSYS code delays. The branch POC for ANSYS, Dr. Gates, had been withholding the newest version 8.0 of the ANSYS-EM code. My task performance had been severely damaged by Dr. Gates' obstructions.

After I was moved out of the NASA branch to a Swales trailer to avoid the hostile work environment, I told about the move to my technical monitor, Dr. Ambur, at our meeting. He said: "If Swales wants to treat me as their employee, then they should find a task for you;" and added something like: "let them know about my deep displeasure. I am going to see what they do until tomorrow. I'll see them at a big review panel, and I can raise some issues." He was clearly threatening. **A few weeks later, I was fired.**

Various NASA contractors and civil servants had been visibly disturbed by the on-going conflict and had been showing signs of pressure to take sides. My work behaviors had been dramatically changed including, but not limited to, the lunches with colleagues, branch lunches, celebrations, branch contractor meetings, developing new interactions in the new group and new colleagues. I had been very productive before, professionally; during the last year, only works from the past had been published.

This formal complaint is the last resort, after all other ways to deal with the discriminatory behavior have been unsuccessful, and the stressful environment has become increasingly hostile, so it has significantly affected in a negative way my daily work activities.

8

V. Kurtz
300C Richardson Run
Williamsburg, VA 23185

(15)

CERTIFIED MAIL

7004 0550 0000 1885 9640

Ms. Brenda Manuel-Alexander, Director
Discrimination Complaint Division/Code E
Office of Equal Opportunity Programs
NASA Headquarters
300 E Street, SW
Washington, DC 20546-0001